**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

CARLOS HERRERA, a/k/a Lazy,

     Defendant - Appellant.

No. 19-2126

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DANIEL SANCHEZ, a/k/a Dan,

     Defendant - Appellant.

No. 19-2141

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ANTHONY RAY BACA, a/k/a Pup,

     Defendant - Appellant.

No. 19-2195

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. Nos. 2:15-CR-04268-JB-25, 2:15-CR-04268-JB-18,
2:15-CR-04268-JB-21)**

_____

Ryan J. Villa, The Law Office of Ryan J. Villa, Albuquerque, New Mexico, for Defendant-Appellant Carlos Herrera; Josh Lee, Assistant Federal Public Defender, Office of the Federal Public Defender, Districts of Colorado and New Mexico (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant Daniel Sanchez; and Theresa M. Duncan, Duncan Earnest LLC, Santa Fe, New Mexico, for Defendant-Appellant Anthony Ray Baca.

Richard Williams, Assistant United States Attorney (Fred J. Federici, Acting United States Attorney, with him on the briefs), Las Cruces, New Mexico, for Plaintiff-Appellee.

_____

Before **BACHARACH**, **BRISCOE**, and **McHUGH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

## TABLE OF CONTENTS

1.  Mr. Herrera, Mr. Sanchez, and Mr. Baca were convicted of
    violating VICAR. .................................................................. 8

    A.  The district court severed the case into multiple trials. ....... 9

    B.  The government continued to furnish discovery during
        and even after the trial. ................................................. 9

    C.  The government furnished much of the discovery through
        tablets, which the cooperating witnesses allegedly viewed
        to coordinate their testimony. ......................................... 9

    D.  The government attributed the Molina murder to orders
        issued by Mr. Baca, Mr. Sanchez, and Mr. Herrera. ............ 10

(1)    Mr. Baca allegedly ordered the "hit" on Javier Molina. .................................................................. 10

(2)    Mr. Baca also allegedly planned the murder of two corrections officials. ............................................. 10

(3)    Mr. Herrera allegedly gave the Molina paperwork to Mr. Rodriguez and Mr. Sanchez. ............................ 11

2.    All defendants: The government did not suppress materially favorable evidence. .............................................. 12

A.    The government must disclose evidence that's favorable, that's in its possession, and that's material. ....................... 12

B.    We use different standards for reviewing the district court's legal conclusions and factual findings. ................... 14

C.    The government delayed many of its disclosures. .............. 14

D.    The recording of Mr. Rodriguez's phone call with his mother was not material. ............................................... 15

(1)    The Rodriguez recording didn't bear materially on Mr. Baca's guilt ................................................... 16

(2)    Nor was the recorded phone call material as to Mr. Herrera or Mr. Sanchez. ......................................... 23

E.    The government did not commit a due process violation by delaying disclosure of Mr. Urquizo's recorded phone calls about the discovery tablets. .................................... 23

(1)    We review for plain error because the Defendants failed to preserve their challenges to the Urquizo recordings. ......................................................... 24

(2)    Mr. Baca does not satisfy the plain-error standard because the government had not obviously suppressed the Urquizo recordings. ......................... 26

F. The government did not deny due process to the Defendants by delaying disclosure of the FBI's typed notes. ........................................................................... 30

G. The government did not violate due process by delaying disclosure of an FBI questionnaire about SNM. ................. 33

H. Considered cumulatively, the late-disclosed evidence was not material. ............................................................. 36

3. Defendants Sanchez and Baca: The district court didn't err in allowing introduction of the evidence of prior bad acts. ............. 37

A. Mr. Sanchez and Mr. Baca forfeited their Rule 403 arguments involving the probative value of enterprise evidence. .............................................................. 38

(1) Mr. Sanchez and Mr. Baca preserved a general Rule 403 argument, triggering the abuse-of-discretion standard. ............................................................ 38

(2) Mr. Sanchez and Mr. Baca forfeited two of their arguments. ........................................................... 40

(3) Even without a waiver, the Defendants' new appellate arguments would fail under the plain-error standard. ............................................................ 44

B. The district court did not abuse its discretion in allowing introduction of evidence about Mr. Sanchez's 2005 assaults. ..................................................................... 48

C. Any possible error would have been harmless when the district court allowed the introduction of evidence of Mr. Baca's commission of murder in 1989. ............................. 51

4. Defendants Sanchez and Herrera: The district court did not err in declining to sever Counts 6–7. ............................................ 55

A. The district court did not violate Rules 403 and 404(b) in allowing the introduction of evidence as to the conspiracy to kill the corrections officials. ....................................... 56

(1)    Mr. Sanchez and Mr. Herrera generally preserved their arguments on probative value. .......................... 57

(2)    The district court did not abuse its discretion in applying Rule 404(b). ............................................ 59

(3)    The district court did not abuse its discretion in applying Rule 403. ................................................. 60

B.    Rule 14 did not require severance. .................................... 64

5.    Defendants Sanchez and Baca: The district court did not abuse its discretion in declining to sever the Defendants' trials. ........... 71

A.    The codefendants' out-of-court statements didn't require severance. .................................................................. 72

(1)    Mr. Sanchez and Mr. Baca waived the issue involving severance of Defendants based on the out-of-court statements. ......................................... 73

(2)    Mr. Sanchez and Mr. Baca failed to timely file pretrial motions to sever the case as to the defendants. ............................................................ 74

(3)    The district court did not raise the issue. .................. 79

(4)    Without good cause, Mr. Sanchez and Mr. Baca waived their arguments under Rule 14 for severance of Defendants based on the recorded statements. ....... 81

(5)    Even without a waiver, the district court would not have erred when declining to sever the case as to the defendants. .................................................... 82

(a)    The district court did not err in declining to sever the Defendants based on the government's recordings. ............................... 83

(i)    Mr. Sanchez and Mr. Baca had not shown actual prejudice. .......................... 83

(ii)    Even if actual prejudice had otherwise existed, the district court enjoyed discretion to alleviate the prejudice through limiting instructions. .................. 88

B.    Severance wasn't required based on live testimony recounting out-of-court statements that had directly implicated Mr. Sanchez. ................................ 91

6.    All defendants: The district court did not abuse its discretion in denying the motions for a continuance. ..................................... 92

A.    We apply the abuse-of-discretion standard. ....................... 92

B.    The district court did not err in denying Mr. Herrera's first request for a continuance. ........................................ 93

C.    The district court did not err in denying the Defendants' second motion for a continuance. .................................... 98

7.    All defendants: The Defendants waived their challenge to the constitutionality of VICAR's position clause. ........................... 106

A.    Because the constitutional argument is not jurisdictional, the Defendants needed to make this argument in a pretrial motion to dismiss. ....................................................... 107

B.    The Defendants failed to raise the constitutional challenge in a timely pretrial motion. ........................................... 113

8.    Defendant Herrera: The district court didn't prevent a full and fair defense by prohibiting Mr. Herrera from impeaching his own out-of-court statements. ....................................................... 117

A.    Mr. Herrera preserved this challenge, so we apply the abuse-of-discretion standard. ........................................ 117

(1)    Preservation didn't require Mr. Herrera to make an offer of proof. ...................................................... 117

(2)    The ruling was definitive. ....................................... 118

B.  The district court did not abuse its discretion in excluding Mr. Herrera's out-of-court statements. ............................ 119

9.  All defendants: No cumulative error occurred. ......................... 123

10.  Conclusion. ................................................................. 125

———————————————

This case arises from the murder of a state inmate and conspiracy to murder two corrections officials. The government attributed the crimes to a prison gang, Sindicato de Nuevo Mexico ("SNM"), and charged many of its members under the Violent Crimes in Aid of Racketeering Act ("VICAR"). *See* 18 U.S.C. § 1959.

This appeal involves the charges against three SNM members (Anthony Ray Baca, Daniel Sanchez, and Carlos Herrera). After a six-week jury trial, they were convicted of (1) conspiring to murder a fellow SNM member (Javier Molina) (Count 6) and (2) aiding and abetting that murder (Count 7). Mr. Baca was also convicted of conspiring to murder two corrections officials (Counts 9–10).

Mr. Baca, Mr. Herrera, and Mr. Sanchez appeal based on eight arguments:

1.  The government suppressed materially favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

2.  The district court erred in admitting evidence of prior bad acts by Mr. Baca and Mr. Sanchez.

3.    The district court erred in failing to sever the counts against Mr. Herrera and Mr. Sanchez.

4.    The district court erred in failing to sever the trials as to Mr. Baca and Mr. Sanchez.

5.    The district court erred in denying two requests for continuances.

6.    VICAR's "position clause" exceeds Congress's power under the U.S. Constitution.

7.    The district court erred in excluding Mr. Herrera's exculpatory statements.

8.    Cumulative errors require a new trial.[1]

We reject these arguments and affirm.

**1.    Mr. Herrera, Mr. Sanchez, and Mr. Baca were convicted of violating VICAR.**

The SNM has operated in the New Mexico state prison system for decades. Mr. Baca had headed the SNM, and Mr. Sanchez and Mr. Herrera had served as mid-level leaders. The government alleged that

---

[1]    This chart shows which defendants have joined each of the eight appellate arguments:

| Issue | Herrera | Sanchez | Baca |
|---|---|---|---|
| *Brady* Violation | x | x | x |
| Admissibility of Bad Acts Evidence | | x | x |
| Severance of Counts | x | x | |
| Severance of Defendants | | x | x |
| Denial of Continuance | x | x | x |
| Constitutionality of VICAR | x | x | x |
| Exculpatory Statements | x | | |
| Cumulative Error | x | x | x |

8

- Mr. Baca, Mr. Sanchez, and Mr. Herrera had orchestrated the murder of a fellow SNM member, Mr. Javier Molina, and

- Mr. Baca had plotted the assassination of two corrections officials to retaliate for their enhancement of security measures after Mr. Molina's murder.

## A. The district court severed the case into multiple trials.

The indictment covered not only Mr. Herrera, Mr. Sanchez, and Mr. Baca, but also nineteen other SNM members. The district court ultimately severed the case into two trials. The court assigned Mr. Herrera, Mr. Sanchez, and Mr. Baca to the first trial (for Counts 6–12).[2]

## B. The government continued to furnish discovery during and even after the trial.

The district court declared the case complex and ordered the government to disclose materially favorable information. The government responded by producing information long before the trial and supplementing the production right before the trial, during the trial, and even after the trial had ended.

## C. The government furnished much of the discovery through tablets, which the cooperating witnesses allegedly viewed to coordinate their testimony.

Because the Defendants and many of the government witnesses were in prison, the parties agreed on distribution of discovery material through

---

[2]    A fourth defendant, Mr. Rudy Perez, was also assigned to this trial. He obtained an acquittal.

tablets. At trial, the Defendants argued that the cooperating witnesses had coordinated their testimony by sharing information from the tablets.

### D. The government attributed the Molina murder to orders issued by Mr. Baca, Mr. Sanchez, and Mr. Herrera.

At trial, the government alleged that the Defendants had occupied various roles in the Molina murder.

#### (1) Mr. Baca allegedly ordered the "hit" on Javier Molina.

Mr. Baca allegedly had "paperwork" showing Mr. Molina's cooperation with law enforcement. According to the government, Mr. Baca arranged for passage of the paperwork to other SNM members at a Las Cruces prison (where Mr. Molina was housed). When the paperwork arrived, SNM members in the Las Cruces prison were to kill Mr. Molina.

#### (2) Mr. Baca also allegedly planned the murder of two corrections officials.

Mr. Baca also allegedly ordered the murder of two New Mexico corrections officials:

1. Gregg Marcantel, the former Secretary of the New Mexico Corrections Department, and

2. Dwayne Santistevan, the former acting director of the Security Threat Intelligence Unit at the New Mexico Corrections Department.

Mr. Baca allegedly ordered these murders as retaliation for the state's stiffening of security measures following the Molina murder. The two officials weren't harmed.

### (3)    Mr. Herrera allegedly gave the Molina paperwork to Mr. Rodriguez and Mr. Sanchez.

Mr. Herrera was an SNM member housed in a pod next to Mr. Molina's. According to the government, Mr. Herrera passed the paperwork from Lupe Urquizo, who forwarded it to Mario Rodriguez and Mr. Sanchez.



When Mr. Sanchez obtained the paperwork, he allegedly organized the killing by obtaining a walker from Rudy Perez, ordering Mr. Rodriguez to make shanks out of the walker, telling Mr. Rodriguez and Timothy Martinez to restrain Mr. Molina, and ordering Jerry Armenta and Jerry Montoya to stab Mr. Molina.[3]

Responding to these allegations, Mr. Sanchez presented two alternative theories based on his codefendants' pretrial statements:

---

[3]    Mario Rodriguez, Jerry Armenta, Timothy Martinez, and Jerry Montoya were also charged with Mr. Molina's murder. But they admitted their involvement, cooperated with law enforcement, and testified for the government.

1.  Mr. Sanchez had not reviewed the paperwork, and Mr. Armenta stabbed Molina in the heat of the moment.

2.  The ringleader for the murder was Mr. Rodriguez, not Mr. Sanchez.

With these theories, Mr. Sanchez attacked the credibility of government witnesses and noted a lack of physical evidence.

**2.    All defendants: The government did not suppress materially favorable evidence.**

The Defendants argue that the district court should have ordered a new trial because the government waited too long to disclose favorable evidence.

**A.    The government must disclose evidence that's favorable, that's in its possession, and that's material.**

Due process requires a new trial if the government suppresses evidence that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a deprivation of due process, a defendant must prove that

*   the evidence was favorable,

*   the government suppressed the evidence, and

*   the suppression resulted in prejudice.

*United States v. Durham*, 902 F.3d 1180, 1221 (10th Cir. 2018). The third element (prejudice) is satisfied only if the suppressed evidence was material. *Id.*

12

A defendant can establish materiality by showing that timely disclosure would have created a reasonable probability of a different result. *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). A probability is "reasonable" if it "undermine[s] confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Wearry v. Cain*, 577 U.S. 385, 392 (2016) (per curiam) ("Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972))). But evidence isn't material just because it might be exculpatory. *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994). The pertinent question is whether the suppression of evidence prevented "a fair trial," which the Supreme Court has defined as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Evidence may be material even when it affects only the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *see Browning v. Trammell*, 717 F.3d 1092, 1106 (10th Cir. 2013) (concluding that suppressed mental-health records were material because they could have been used to attack a key witness's credibility). When the evidence involves credibility, however, the witness must be "absolutely critical to the government's case." *United States v. Cooper*, 654 F.3d 1104, 1123 (10th Cir. 2011). Even then, the evidence might not be material. *United*

13

*States v. Trujillo*, 136 F.3d 1388, 1393 (10th Cir. 1998). For example, evidence isn't material when it is "cumulative" of other impeachment evidence or bears only an insignificant effect on the impeachment evidence. *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009); *see Trujillo*, 136 F.3d at 1394 ("[A]n incremental amount of impeachment evidence on an already compromised witness does not amount to material evidence.").

B.   **We use different standards for reviewing the district court's legal conclusions and factual findings.**

When a due process claim is preserved, we conduct de novo review of legal conclusions and apply the clear-error standard to factual findings. *United States v. Garcia*, 793 F.3d 1194, 1205 (10th Cir. 2015). We also apply this standard when considering whether the defendant is entitled to a new trial based on a denial of due process. *See United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014) ("In a long line of cases, we have held that in the new-trial context we review de novo a district court's ruling on a *Brady* claim, with any factual findings reviewed for clear error."). But when the defendant fails to preserve a claim of due process, we review only for plain error. *United States v. Simpson*, 845 F.3d 1039, 1057 (10th Cir. 2017).

C.   **The government delayed many of its disclosures.**

The government made six late disclosures:

14

1.  About two months before trial, the government disclosed over 60,000 audio recordings, totaling more than 15,000 hours.

2.  About a month before trial, the government disclosed about 10,000 pages of new discovery and 6 more phone recordings.

3.  Roughly 2 weeks before trial, the government disclosed more than 6,000 pages of discovery.

4.  During voir dire, the government disclosed about 3,500 more pages.

5.  After presenting its case-in-chief, the government disclosed almost 1,000 pages of Mr. Rodriguez's personal documents and almost 500 pages of FBI field notes from interviews of government witnesses.

6.  About 3 months after the trial, the government disclosed over 50 audio recordings of calls from Mr. Rodriguez.

For four of these items, the Defendants characterize the late disclosures as a denial of due process:

1.  A recording of Mr. Rodriguez's phone call to his mother

2.  Recordings of Mr. Urquizo's phone calls about what he saw on the discovery tablets

3.  The FBI's typed notes of an interview with Mr. Urquizo

4.  An FBI questionnaire about SNM

**D.    The recording of Mr. Rodriguez's phone call with his mother was not material.**

The Defendants allege that the government waited too long to disclose the recording of a phone call between Mr. Rodriguez and his mother. In the phone call, Mr. Rodriguez told his mother: "The only one they want to use me against is Dan [Mr. Sanchez]. And they won't use me

15

against Pup [Mr. Baca] because I don't have nothing on him." R. vol. 1, at 1921. The government didn't disclose evidence of the phone call until over three months after the trial.[4] The district court concluded that the late disclosure hadn't violated the Defendants' rights to due process. *Id.* at 2880–81. For this conclusion, we conduct de novo review. *See* p. 14, above.

The Defendants argue that the recording of the phone call was suppressed, favorable, and material. We assume that the recording was suppressed and favorable. But even if the recording had been suppressed and favorable, it wouldn't have been material.

**(1)    The Rodriguez recording didn't bear materially on Mr. Baca's guilt.**

Mr. Baca argues that Mr. Rodriguez's recorded statements were material because they

- contradicted Mr. Rodriguez's trial testimony against Mr. Baca and

- would have constituted stronger impeachment evidence than the other evidence that Mr. Baca had used to impeach Mr. Rodriguez.

Neither argument is persuasive.

---

[4]    The phone call took place in November 2017, and the government produced the recording about seven months later. By then, the trial had already finished.

16

We may assume for the sake of argument that Mr. Rodriguez's trial testimony contradicted what he had said to his mother. Even with this assumption, the statement would have lacked materiality because Mr. Baca had impeached Mr. Rodriguez with similar inconsistent statements to the FBI. Like the statements to Mr. Rodriguez's mother, his statements to the FBI had downplayed Mr. Baca's role in the Molina murder.

When the district court ruled on the issue, it was considering Mr. Baca's motion for a new trial. In that motion, Mr. Baca emphasized the similarity between what Mr. Rodriguez had told the FBI and his mother. Within roughly three weeks, Mr. Rodriguez had talked to both the FBI and his mother. To the FBI, Mr. Rodriguez had said that

- Mr. Baca liked Mr. Molina,

- Mr. Rodriguez didn't know if Mr. Baca wanted Mr. Molina murdered, and

- Mr. Rodriguez thought that Mr. Baca would have stopped the murder if he'd been at the Las Cruces prison.

Three weeks later, Mr. Rodriguez told his mother that he had no incriminating information against Mr. Baca.

On appeal, Mr. Baca attributes power to Mr. Rodriguez's statements to his mother, arguing that they had contradicted his trial testimony that Mr. Baca had

- said that Mr. Molina was supposed to have been killed much earlier,

17

- shared details about the Molina murder that few people had known,

- conspired to intimidate another prosecution witness (Jerry Armenta), and

- discussed his plan to murder the two correction officials.

But the jury heard about the same inconsistencies between Mr. Rodriguez's trial testimony and his earlier statements to his mother. In the recorded phone call, Mr. Rodriguez remarked to his mother that he wouldn't need to testify against Mr. Baca because he had nothing incriminating to say. This remark tracks Mr. Rodriguez's statement to the FBI three weeks earlier, acknowledging that he had no incriminating information against Mr. Baca. Indeed, in his motion for a new trial, Mr. Baca told the district court that Mr. Rodriguez's statements to the FBI were "consistent with [his] statement to his mother that he did not 'have anything on' Mr. Baca." R. vol. 1, at 1921.

The government had timely disclosed the FBI's notes from the interview with Mr. Rodriguez, and the defense used these statements to cross-examine Mr. Rodriguez. Given this cross-examination, Mr. Rodriguez's statement to his mother would have added little to Mr. Baca's defense related to the Molina murder. Mr. Rodriguez told his mother that prosecutors wouldn't use him against Mr. Baca, but the jury already knew that Mr. Rodriguez had just told the FBI that Mr. Baca would probably have stopped the murder if he'd been there.

Mr. Rodriguez's statement to his mother also fit what he had told the FBI about the plot to murder the corrections officials. The FBI's notes from the interview with Mr. Rodriguez contained no mention of Mr. Baca's involvement with the plot, and the defense used that omission to cross-examine Mr. Rodriguez. Mr. Rodriguez responded that he had "told [the FBI that he] knew specific things" about the plot to murder the corrections officials but didn't "think [they] got around to" the issue in the interview. R. vol. 5, at 8295–96.

Mr. Rodriguez's statement to his mother added little that was new: when he talked to his mother, he hadn't given the FBI any incriminating details about Mr. Baca's involvement in the plot to kill the corrections officials. So Mr. Rodriguez's statement to his mother tracked what he'd told the FBI.

Mr. Baca characterizes Mr. Rodriguez's statements to his mother as "qualitatively different from, and considerably more powerful than" other impeachment evidence by "*directly contradict[ing]* Mr. Rodriguez's allegations that Mr. Baca [had] told him things that implicated Mr. Baca in the charged offenses." Baca's Opening Br. at 34 (emphasis in original). But these contradictions are apparent from the FBI's notes, and Mr. Baca used those notes at trial. Mr. Baca never says how Mr. Rodriguez's statements to his mother differed from what he had told the FBI.

19

Nor has Mr. Baca shown a meaningful difference between Mr. Rodriguez's statements to his mother and other evidence that the defense had used for impeachment. For materiality, the evidence cannot just be "cumulative," *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009), or "additional impeachment evidence," *Nuckols v. Gibson*, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000) (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998)). To the contrary, the statements must "significantly enhanc[e] the quality of the impeachment evidence." *Douglas*, 560 F.3d at 1174.

Mr. Baca argues that the extensive impeachment of Mr. Rodriguez made the other evidence more important, not less. But the incremental value of more impeachment evidence generally dissipates when the witness has already faced strong impeachment:

> [W]here the credibility of a witness "has already been substantially called into question in the same respects by other evidence, additional impeachment will generally be immaterial and will not provide the basis for a *Brady* claim." Furthermore, we have indicated that "an incremental amount of impeachment evidence on an already compromised witness does not amount to material evidence."

*United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011) (citations omitted).

Mr. Rodriguez's statements to his mother were merely "additional impeachment evidence" because he had already been impeached with prior

20

inconsistent statements. Apart from the lies to law enforcement, the

Defendants impeached Mr. Rodriguez with his

- false denial of official membership in SNM,

- prior convictions for criminal sexual penetration, residential burglary, and aggravated battery with a deadly weapon,

- effort to flee the country, and

- statement that he had planned to murder Mr. Herrera after hearing his recorded statements.

R. vol. 5, at 8236–37, 8246–47, 8287–88, 8295–96, 8308, 8310, 8394–99.

And on cross-examination, Mr. Rodriguez admitted lying to the FBI and

withholding Mr. Baca's comments about killing the corrections officials.

Though Mr. Baca could have impeached Mr. Rodriguez's testimony with

his statements to his mother, those statements would have added little.

In his reply brief, Mr. Baca states that during cross-examination, Mr.

Rodriguez "was able to quibble" about the accuracy of the FBI's reports

because they were written summaries rather than "verbatim recordings of

those statements." Baca's Reply Br. at 14. For this statement, Mr. Baca

cites this exchange with the prosecutor:

Q. But did you say Baca liked Molina?

A. For certain reasons, yes.

Q. And you also told the FBI that if Baca had been living in Southern, that he could have stopped or would have stopped the Molina murder?

. . . .

21

Q.    These are simple questions, yes or no, Mr. Rodriguez.

A.    You have to read the whole paragraph.

Q.    I don't have to read the whole paragraph.

A.    I can't answer the question.

Q.    So you don't remember?

A.    Read it.

Q.    Do you remember talking to the FBI on October 24, 2017?

A.    Yes.

Q.    Do you remember telling [the FBI] that Baca would have stopped the hit if he'd have been at Southern New Mexico Correctional Facility?

A.    Can you read the whole paragraph?

Q.    It's a yes-or-no question, Mr. Rodriguez.

A.    That's part of the paragraph--the statement that I made, yes.

Q.    Did you make that statement?

A.    I did.

R. vol. 5, at 8287–89.

Mr. Rodriguez didn't "quibble" based on the lack of a verbatim record, and he *never* questioned the accuracy of the FBI's records of what he'd said. So Mr. Baca would have obtained little from further cross-examining Mr. Rodriguez with the statements to his mother. The recording

of the phone call with Mr. Rodriguez's mother was thus immaterial as to Mr. Baca.

**(2)    Nor was the recorded phone call material as to Mr. Herrera or Mr. Sanchez.**

Mr. Rodriguez's recorded statements to his mother were also immaterial as to Mr. Herrera and Mr. Sanchez.

Mr. Rodriguez testified against both Mr. Herrera and Mr. Sanchez. Given that testimony, Mr. Herrera and Mr. Sanchez argue that the recorded statements undermined all of Mr. Rodriguez's testimony. But this impeachment added little that was new. *See* Part 2(D)(1), above. So the suppression of this call did not constitute a denial of due process to Mr. Sanchez or Mr. Herrera.

**E.    The government did not commit a due process violation by delaying disclosure of Mr. Urquizo's recorded phone calls about the discovery tablets.**

The Defendants also point to Mr. Urquizo's recorded calls, which contained three references to what he'd seen on discovery tablets:

1.    "[Mr. Baca] was pretty much writing letters he wasn't suppose to be doing. All that stuff came out. It's on the tablet. Like, there's so much stuff, . . . that it's just crazy." R. vol. 1, at 2273 (Sept. 20, 2017).

2.    "I seen my mugshot, like uh, whenever I was younger because the homie has a tablet with all the case right. . . . And I went back and I seen my mugshot when I was like–when I first came to prison at seventeen. And I had no tattoos on my face or nothing." *Id.* at 2272 (Oct. 12, 2017).

3.    "The tablet that my homie has, it has a lot of shit. It has all those vatos that are dead. Like pictures of them dead. Like fucking they show the videos of the stabbings and everything, and, you know, it's like damn, its crazy . . . . Yeah, it has everything. Everything. Like all that shit and it has–and I seen all my mugshots when I was a little kid. . . . But yeah it shows everything. It shows the vatos getting killed and the pictures afterwards." *Id.* at 2272 (Oct. 29, 2017).

The government's delay in disclosing these recordings did not result in a denial of due process.

### (1)    We review for plain error because the Defendants failed to preserve their challenges to the Urquizo recordings.

The Defendants failed to preserve their challenges involving these recordings. Mr. Baca did present the recorded phone calls when moving for a new trial, but he did so only in his reply brief and not in the context of a due-process claim for suppression of evidence. In the reply brief, he urged a new trial based on Mr. Urquizo's false testimony, pointing to

- his trial testimony that he had not received a discovery tablet or seen the discovery and

- his recorded statements acknowledging that he'd seen evidence on the discovery tablets.

Mr. Baca's claim involving false testimony differed from a claim involving suppression of exculpatory evidence:

A defendant may have a *Brady* claim if the witness *unintentionally* gave false testimony or the prosecution did not correct testimony that it *should have known* was false. But this court has repeatedly spoken of *Napue* claims as requiring perjury, and the prosecutor's knowledge of the falsity by the witness. A prosecutor's knowing use of perjured testimony is

24

misconduct that goes beyond the denial of a fair trial, which is the focus of *Brady*.

*United States v. Garcia*, 793 F.3d 1194, 1207–208 (10th Cir. 2015) (citations omitted; emphasis in original). Given these differences, a claim involving suppression of favorable evidence is "distinct" from a claim involving the knowing use of perjured testimony. *Douglas v. Workman*, 560 F.3d 1156, 1174 n.13 (10th Cir. 2009); *accord Morris v. Ylst*, 447 F.3d 735, 743 n.8 (9th Cir. 2011) (stating that these claims are "analytically distinct").

Despite the analytical distinction of these claims, Mr. Baca insists that his motion for a new trial referred to *Brady v. Maryland*, 373 U.S. 83 (1963), the seminal case on the suppression of material evidence when seeking a new trial. But Mr. Baca disregards the context of his argument for a new trial. He had urged a new trial based on the government's failure to correct Mr. Urquizo's false testimony—not the government's delay in disclosing his recordings. R. vol. 1, at 2271–74. Indeed, Mr. Baca "acknowledges that he did not explicitly argue below that the government [had] suppressed the Urquizo calls." Baca's Reply Br. at 2–3.

When Mr. Baca appealed, he changed his theory, arguing for the first time that the government had suppressed the Urquizo recordings. Mr. Baca thus forfeited this theory even though it fell "under the same general category as an argument presented at trial." *See United States v. Leffler*,

25

942 F.3d 1192, 1196 (10th Cir. 2019) (stating that the appellant forfeited an appellate argument even though it had fallen into the same "general category" as an argument made in district court (quoting *United States v. Nelson*, 868 F.3d 885, 891 n.4 (10th Cir. 2017))).

Because Mr. Baca forfeited the claim and didn't urge plain error in his opening brief, "we [would] ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *Id.* at 1196; *see* p. 83, below. But Mr. Baca used his reply brief to urge plain error, and we have discretion to consider the issue for plain error. *See, e.g.*, *United States v. Yurek*, 925 F.3d 423, 445 (10th Cir. 2019); *United States v. Courtney*, 816 F.3d 681, 683–84 (10th Cir. 2016). We exercise that discretion, considering whether the district court had plainly erred by failing to order a new trial for the delay in disclosure.

**(2)** **Mr. Baca does not satisfy the plain-error standard because the government had not obviously suppressed the Urquizo recordings.**

Under the plain-error standard, Mr. Baca must show "(1) [an] error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Maynard*, 984 F.3d 948, 966 (10th Cir. 2020) (quoting *United States v. Wireman*, 849 F.3d 956, 962 (10th Cir. 2017)). We can assume for the sake of argument that an error took place when the government delayed disclosure of the Urquizo recordings.

26

Even with this assumption, Mr. Baca's argument would fail at the second step. There Mr. Baca needed to show that the delay had clearly or obviously constituted a denial of due process. *See United States v. Miller*, 978 F.3d 746, 763 (10th Cir. 2020) (stating that an error is "plain" only when it's "clear or obvious under current, well-settled law" (quoting *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012))). We ordinarily consider an error "clear or obvious" "only when the Supreme Court or our court has addressed the issue." *United States v. Leal*, 32 F.4th 888, 897–98 (10th Cir. 2022).

Here the issue involves disclosure before trial, but arguably amidst so much other evidence that Mr. Baca couldn't realistically use the recordings. Neither the Supreme Court nor our court has ever found a due process violation in similar circumstances.

Granted, we've recognized that a delay in the disclosure could create a denial of due process. *United States v. Ahrensfeld*, 698 F.3d 1310, 1319 (10th Cir. 2012). For a denial of due process, however, Mr. Baca must show that an earlier disclosure would have created a reasonable probability of a different outcome. *Id.*

Mr. Baca points out that the Urquizo recordings came with roughly 60,000 other recordings of calls, which spanned roughly 15,000 hours. Given the number and duration of the recordings, Mr. Baca maintains that he couldn't have reviewed the Urquizo calls in the runup to trial. The

27

government disagrees, questioning the burden imposed on the Defendants because many of these recordings related to potential witnesses in a later trial. We need not resolve this dispute because our caselaw does not make it *clear* or *obvious* that the delay would have constituted suppression.

The government made two sets of disclosures the month before trial. The first set of disclosures (Dec. 4, 2017) apparently involved electronic submission of files to defense counsel, and no index existed for those audio files. The second set of disclosures (Dec. 18, 2017) included a cover letter with an index of all the .pdf documents and audio/video files that had been disclosed. The recordings of the Urquizo phone calls do not appear in the index of .pdf and audio/video files, so these recordings were presumably part of the first set of disclosures. Because those disclosures contained no index, defense counsel might have needed to listen to all of the new recordings.

But under the plain-error standard, Mr. Baca must show that the government had *clearly* or *obviously* suppressed the Urquizo recordings by waiting too long to disclose them. *See United States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008) (concluding that the defendants hadn't shown plain error because the evidence wasn't obviously withheld by the prosecution). The obviousness of the violation turns on whether the government had disclosed the Urquizo recordings in time for Mr. Baca to use them at trial. *See United States v. Battles*, 745 F.3d 436, 446 (10th Cir.

28

2014). Disclosure on the eve of trial wasn't clearly or obviously too late, for we've held that the disclosure was timely even when it had come near the end of the trial. *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997). Given this holding, we don't view the timing of the disclosure as clearly or obviously too late for due process.

Mr. Baca doesn't argue that the Urquizo recordings would have tipped the balance toward acquittal. Instead, Mr. Baca complains that he lost the opportunity to "strategically situate" the recordings "into organized, original cross-examinations that held together with collective narrative flow and integrity." Baca's Opening Br. at 49. We may assume for the sake of argument that earlier disclosure would have enhanced Mr. Baca's cross-examination of Mr. Urquizo. But Mr. Baca hasn't shown that the enhancement would have clearly or obviously created reasonable doubt. Without that showing, we conclude that Mr. Baca failed to satisfy his burden of showing plain error. *See Burke*, 571 F.3d at 1057 (concluding that despite the plausibility of an effect on the defense's strategy, the defendant's theory of prejudice was not "plainly correct" for purposes of plain-error review).

29

### F.    The government did not deny due process to the Defendants by delaying disclosure of the FBI's typed notes.

The Defendants also point to delayed disclosure of the FBI's typed notes from an interview with Mr. Urquizo. In the interview, Mr. Urquizo told the FBI that

- Mr. Sanchez was supposed to cover the camera and didn't and

- Mr. Sanchez's failure to cover the camera led SNM members to discuss killing him in retaliation.

The government reported on this interview, but the report omitted some details in the typed interview notes. Mr. Baca argues that the government suppressed the typed notes "until long after the defense could make effective use of [them]." Baca's Opening Br. at 39.

In our view, however, the delay didn't constitute suppression. The interview took place in late January 2018; and the government disclosed the notes roughly a month later, as the trial was in progress. At trial, Mr. Sanchez's attorney brought the notes to the district court's attention. In response, the court allowed all of the defendants to recall Mr. Urquizo so that they could cross-examine him with the notes.

The three defendants declined to recall Mr. Urquizo. But Mr. Sanchez called the FBI agent who had taken the notes and questioned the agent extensively about what Mr. Urquizo had said. Given that cross-examination and the opportunity afforded to Mr. Baca and Mr. Herrera, the government did not suppress the typed notes.

30

Even if we were to consider the typed notes suppressed, they would have been immaterial. Evidence is material if it would "shake[] our confidence in the guilty verdict." *United States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008).

Under this standard, the typed notes weren't new material evidence. Mr. Sanchez disagrees, pointing to their descriptions of Mr. Urquizo's statements as support for his denial of involvement in the Molina murder. But these statements by Mr. Urquizo did not constitute new evidence. Mr. Sanchez already had notes from Mr. Urquizo's FBI interview in March 2017. In that interview, Mr. Urquizo had discussed an SNM plan to kill Mr. Sanchez for failing to cover the camera.

The Defendants try to distinguish the FBI's notes from the interviews in March 2017 and January 2018, pointing out that Mr. Urquizo had referred in the later interview to anger by SNM leadership for Mr. Sanchez's failure to "participate in the Molina homicide or even cover the camera like he was supposed to." R. vol. 1, at 1846. But the notes from March 2017 had also discussed the possible murder of Mr. Sanchez for failing to cover the camera. Both sets of notes are consistent as to (1) Mr. Sanchez's assignment to cover the camera, (2) his failure to carry out that assignment, and (3) the talk about murdering Mr. Sanchez in retaliation. The government's theory was that Mr. Sanchez had participated in the

plans to murder Mr. Molina, and the typed notes do not contain new information undermining that theory.

The Defendants also argue that Mr. Urquizo's statements to the FBI in January 2018 would have helped Mr. Sanchez to show Mr. Rodriguez's role in orchestrating the Molina murder. But this information was not new. The government had timely disclosed the FBI's report from the March 2017 interview, and this report matches what Mr. Urquizo later said in January 2018. In both interviews, Mr. Urquizo told the FBI that Mr. Rodriguez

- had asked about the Molina paperwork,

- had obtained it from Mr. Herrera,

- had said in writing that the Molina murder was imminent, and

- had reacted angrily toward Mr. Sanchez for failing to cover the camera.

So if the January 2018 interview had incriminated Mr. Rodriguez, the March 2017 report would have done the same thing. The information in the typed notes thus wasn't new or inconsistent with other trial evidence about Mr. Rodriguez's role.

Nor were the typed notes material as to Mr. Baca and Mr. Herrera. The notes refer to involvement by Mr. Sanchez, not Mr. Baca or Mr. Herrera. So Mr. Baca and Mr. Herrera could have used the notes only as impeachment evidence.

They argue that the notes "exposed more generally how the government witnesses [had] routinely changed their stories to benefit the prosecution and to target the defendants who had chosen to go to trial rather than plead guilty." Baca's Opening Br. at 40; *see also* Herrera's Opening Br. at 89 (adopting Mr. Baca's *Brady* argument). But materiality required "significant[] enhance[ment] [of] the quality of the impeachment"—not just cumulative evidence of bias. *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009). Under this standard, the typed notes were immaterial. Even without the notes, the Defendants managed to extensively impeach government witnesses with their changing stories. Given that extensive impeachment, the typed notes would have been cumulative as to Mr. Baca and Mr. Herrera.

G.    **The government did not violate due process by delaying disclosure of an FBI questionnaire about SNM.**

The Defendants also complain about the timing of the government's disclosure of a questionnaire. The FBI used the questionnaire, which contained 213 questions, when asking a potential witness about

- his background,

- when, why, and how the individual had joined the SNM,

- who could join the SNM,

- how the SNM was organized,

- how the SNM trafficked in drugs, and

33

- what role SNM members might have played in the crimes being investigated.

The Defendants argue that

- the questionnaire "opened up a new line of defense"—that the government had targeted the Defendants during the investigation and

- "the government's investigation techniques had tainted its witnesses."

Baca's Opening Br. at 41. For these arguments, we conduct de novo review, *United States v. Cooper*, 654 F.3d 1104, 1119 (10th Cir. 2011), and conclude that the late disclosure of the FBI questionnaire did not constitute a denial of due process.

The questionnaire was not suppressed. It was disclosed the day before opening statements. Because the Defendants received the questionnaire before opening statements, they could have used the questionnaire at trial.

In fact, Mr. Sanchez did use the questionnaire at trial when cross-examining an FBI agent. Though Mr. Baca's attorneys heard the cross-examination about the questionnaire, they deny recognizing its importance until later because it had been produced with over 12,000 pages. But Mr. Sanchez's use of the questionnaire should have alerted Mr. Baca to the significance of the questionnaire.

But even if we were to consider the FBI questionnaire suppressed, the Defendants have not shown materiality. In the context of evidence

34

"produced during trial, we focus on 'whether there is a reasonable probability that the outcome of [the trial] would have been different had the [government] disclosed th[e] information earlier.'" *United States v. Ahrensfeld*, 698 F.3d 1310, 1318 (10th Cir. 2012) (quoting *Knighton v. Mullin*, 293 F.3d 1165, 1172–73 (10th Cir. 2002) (alterations in original)).

Mr. Baca argues that the questionnaire shows that the government targeted his codefendants and himself. For example, he points to this excerpt:

> 106. Javier Molina was killed in 2014 at the Southern New Mexico Correctional Facility by . . . Anthony Baca, . . . Daniel Sanchez, Carlos Herrera, and Rudy Perez.
>
> 107. Did . . . Anthony Baca, . . . Daniel Sanchez, Carlos Herrera, or Rudy Perez talk to you about the murder? If so, what did they say?

R. vol. 1, at 1900.

But this excerpt was crossed out, suggesting that the government didn't even use this part of the questionnaire. Moreover, the questions about the conspiracy to murder the corrections officials didn't refer to a particular suspect. To the contrary, the questions were open-ended, asking who had raised the idea of killing the officials. Because the problematic excerpt was crossed out and the questions about the corrections officials did not name any suspects, the questionnaire was immaterial.

Mr. Baca also argues that the delay in disclosure prevented him from strategically using the document. "The relevant standard of materiality,

35

however, does not focus on trial preparation but instead on whether presentation of the evidence would have created a reasonable doubt of guilt that did not otherwise exist." *United States v. Behrens*, 689 F.2d 154, 1558 (10th Cir. 1982). Under this standard, materiality requires more than vague complaints about an effect on trial strategy. *United States v. Young*, 45 F.3d 1405, 1409 (10th Cir. 1995).

Mr. Baca has provided few specifics, stating only in broad terms that he would have been better prepared if he'd had the questionnaire earlier. Even if Mr. Baca would have been better prepared, however, he hasn't shown how strategic use of the questionnaire would have created reasonable doubt. So we conclude that the questionnaire was immaterial as to Mr. Baca.

Because the government didn't suppress the questionnaire and it was immaterial as to Mr. Baca, the delayed disclosure didn't violate his right to due process.

### H.    Considered cumulatively, the late-disclosed evidence was not material.

When multiple items are suppressed, we view their materiality in combination. *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018). But in considering materiality, we include only those items that were suppressed. *See United States v. Brown*, 650 F.3d 581, 591 n.21 (5th Cir. 2011) ("Because we do not consider the materiality of any non-suppressed

36

information, we consider only the cumulative materiality of the suppressed portions of [the pertinent notes and testimony].").

We have held that only one item was suppressed: the recording of Mr. Rodriguez's phone call to his mother. So there's nothing to cumulate when we consider the materiality of the suppressed evidence. *See Kennell v. Dormire*, 873 F.3d 637, 641 (8th Cir. 2017) (concluding that the district court didn't fail to consider the cumulative effect of suppressed items because "there was only one arguable instance of the suppression of *Brady* material").

**3.    Defendants Sanchez and Baca: The district court didn't err in allowing introduction of the evidence of prior bad acts.**

Mr. Sanchez and Mr. Baca argue that the district court should have granted a new trial based on the introduction of evidence as to their prior bad acts. This evidence involved

- Mr. Sanchez's acts of assault in 2005 and

- Mr. Baca's commission of murder in 1989.

Defendants Sanchez and Baca complain that this evidence created a danger of unfair prejudice by suggesting violent propensities.

We conclude that the district court did not abuse its discretion in allowing introduction of evidence that Mr. Sanchez had committed assaults in 2005. And even if the court had erred in allowing the introduction of evidence about the 1989 murder, the error would have been harmless.

37

**A.    Mr. Sanchez and Mr. Baca forfeited their Rule 403 arguments involving the probative value of enterprise evidence.**

The government challenges the preservation of the Defendants' appellate arguments. In considering these challenges, we conclude that the Defendants preserved a general argument for exclusion under Rule 403. But Mr. Sanchez and Mr. Baca didn't preserve their appellate arguments involving (1) the availability of alternative enterprise evidence and (2) the lack of a dispute over the enterprise element.

**(1)    Mr. Sanchez and Mr. Baca preserved a general Rule 403 argument, triggering the abuse-of-discretion standard.**

The government argues that when Mr. Sanchez and Mr. Baca objected, they didn't state a specific ground for objecting under Rule 403. *See* Fed. R. Evid. 103(a)(1) (noting that preservation requires identification of "the specific ground") We disagree.

Mr. Sanchez and Mr. Baca moved in limine to exclude the evidence. In these motions, Mr. Sanchez and Mr. Baca invoked Fed. R. Evid. 404(b) and asked the district court to "balance the evidence's probative value and prejudicial effect under Fed. R. Evid. 403." R. vol. 1, at 1156, 1432; Supp. R. vol. 2, at 483. In requesting this balancing, Mr. Sanchez and Mr. Baca urged sensitivity to the danger of unfair prejudice from evidence of a defendant's prior bad acts. R. vol. 1, at 1157 (quoting *United States v.*

*Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985)), 1432–33 (same); Supp. R. vol. 2, at 483 (same).

By invoking Rule 403 and requesting balancing, Mr. Sanchez and Mr. Baca preserved a general argument that the danger of unfair prejudice had substantially outweighed the probative value. *See K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 n.8 (10th Cir. 1985) (concluding that objections identifying exhibits as "cumulative" were "specific enough to preserve the Rule 403 issue for appeal"); *see also United States v. Grooms*, 2 F.3d 85, 88 n.1 (4th Cir. 1993) (concluding that a defendant had preserved a Rule 403 argument by stating that the evidence was "so much more inflammatory and prejudicial than [it was] probative").

The government argues that Mr. Sanchez and Mr. Baca had relied at trial solely on a failure to link the evidence to SNM. This argument seemingly stems from the Defendants' oral objections. But these oral objections did not displace the Rule 403 argument that Mr. Sanchez and Mr. Baca had presented in their motions in limine.[5]

---

[5] Granted, appellants must generally renew a Rule 403 objection for preservation. *United States v. McVeigh*, 153 F.3d 1166, 1200 (10th Cir. 1998). But renewal is unnecessary if "the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge." *Id.*; *see also* Fed. R. Evid. 103(b) (stating that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal"). Mr. Sanchez and Mr. Baca satisfied these requirements by

Given preservation of the Defendants' argument under Rule 403, we review the rulings for an abuse of discretion. *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013). "Our abuse of discretion review 'affords the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues.'" *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir. 2013) (quoting *United States v. Cerno*, 529 F.3d 926, 935–36 (2008)). To determine whether the district court acted within its considerable realm of discretion, we assign the evidence "its maximum reasonable degree of relevance and its minimum reasonable danger of unfair prejudice." *United States v. Tee*, 881 F.3d 1258, 1273 (10th Cir. 2018).

**(2)    Mr. Sanchez and Mr. Baca forfeited two of their arguments.**

Though Mr. Sanchez and Mr. Baca preserved a general argument for exclusion under Rule 403, they make two new arguments:

1.   The evidence of prior bad acts lacked probative value because the district court could have considered other evidence of a racketeering enterprise.

2.   The probative value was minimal because the Defendants hadn't disputed SNM's status as a racketeering enterprise.

---

presenting a Rule 403 argument in their motions in limine and obtaining an unequivocal ruling. Supp. R. vol. 2, at 879–80.

Mr. Sanchez and Mr. Baca forfeited these arguments by failing to present them in district court. *See United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007) (holding that a party preserves only the specific grounds stated in the objection in district court).

To avoid forfeiture, Mr. Sanchez insists in his reply brief that the district court knew of less prejudicial methods of proof. But in the opening briefs, the Defendants had raised only the availability of alternative evidence, not the court's *knowledge* of the alternative evidence. Making the argument in the reply brief was too late. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (stating that the "court does not ordinarily review issues raised for the first time in a reply brief").

The argument was not only late but also meritless because it assumes that evidence must be excluded whenever the district court knows of less prejudicial ways to prove something. Why would the court's awareness of other evidence require sua sponte intervention? *See United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978) ("Since the 'specific' objection requirement of Fed. R. Evid. 103(a) was not complied with, the trial judge was not required to deal with Rule 403."); *see also* 22A Charles Alan Wright & Kenneth W. Graham, Jr., *Fed. Prac. & Proc.: Evid.* § 5224 (2014) (stating that "[m]ost cases" don't require the judge to apply Rule 403 "without a request from a party"). So regardless of what the district court might have known, it had no duty to exclude the evidence under Rule

41

403 without an objection. *See Polys v. Trans-Colo. Airlines, Inc.*, 941 F.2d 1404, 1409–10 (10th Cir. 1991) (stating that the district court had no obligation to sua sponte reconsider an evidentiary ruling, despite knowing the significance of excluded evidence, because the lack of an objection would have prevented a meaningful appellate record).

Mr. Sanchez and Mr. Baca also argue that when they told the district court that the evidence had minimal probative value, they were implicitly asking the district to consider alternative evidence of an enterprise. For this argument, the Defendants rely on *United States v. Watson*, 766 F.3d 1219 (10th Cir. 2014), which stated in a footnote that "the assessment of the probative value of evidence under Rule 403 [was] distinct from the evidence's relevance under Rule 401 in that the measurement of probative value '[was] determined by comparing evidentiary alternatives.'" *Id.* at 1242 n.16 (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 404.21[3][a], at 404–82.1). But *Watson* did not *require* a district court to examine alternative evidence when the objecting party hasn't relied on alternative methods of proof.

Mr. Sanchez also points to *United States v. McIntosh*, 29 F.4th 648, 654 (10th Cir. 2022), arguing that he can include additional detail on appeal. But in *McIntosh*, we recognized preservation only when the district court had a chance to consider the argument. *Id.* at 655. There the appellant's arguments on appeal were "substantially similar—if not

identical—to his arguments below," and the district court had expressly considered those arguments in a thorough written opinion. *Id.* at 654–55.

That is not the case here: Mr. Sanchez and Mr. Baca didn't alert the district court to an argument about (1) the existence of alternative enterprise evidence or (2) a lack of controversy over the enterprise element. So Mr. Sanchez and Mr. Baca didn't properly preserve those arguments.

Mr. Sanchez and Mr. Baca cite two other opinions bearing on the relationship between alternative forms of proof and probative value:

- *Old Chief v. United States*, 519 U.S. 172, 182–83 (1997), and

- *Carnell Construction Corp. v. Danville Redevelopment & Housing Authority*, 745 F.3d 703, 719 (4th Cir. 2014).

But these opinions didn't suggest that courts must sua sponte consider alternative forms of proof. [6]

---

[6]     Mr. Sanchez and Mr. Baca also cite an out-of-circuit case, which stated that an objecting party needs only to "raise[] the crux of its objection" in district court rather than "all the details of its position." *United States v. Irey*, 612 F.3d 1160, 1224 n.44 (11th Cir. 2010) (en banc) (quoting *United States v. Smith*, 39 F.3d 1143, 1146 (11th Cir. 1994)). There the Eleventh Circuit said that the government's objection to a sentence as substantively unreasonable was sufficient to preserve the specific grounds for the objection it had already raised in district court. *Id.* This statement supports our conclusions that the Defendants

- preserved a general Rule 403 argument and

- forfeited the two specific grounds not presented in district court.

43

Because Mr. Sanchez and Mr. Baca didn't preserve their appellate arguments regarding other forms of proof and the lack of a dispute over an enterprise, we'd ordinarily apply the plain-error standard. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). But Mr. Sanchez and Mr. Baca do not urge plain error. So we consider the two appellate arguments waived. *Id.*

**(3)     Even without a waiver, the Defendants' new appellate arguments would fail under the plain-error standard.**

Even if we were to apply the plain-error standard, these appellate arguments would fail. On plain-error review, the Defendants must show not only that the district court erred but also that the error was "'clear or obvious' under 'current, well-settled law.'" *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005) (quoting *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000)); *see also* p. 26, above. We have declined to find plain error in the admission of evidence under Rule 403 even when we disagree with the court's balancing. *United States v. Ibarra-Diaz*, 805 F.3d 908, 929 (10th Cir. 2015).

Mr. Baca and Mr. Sanchez downplay the probative value of the evidence as to bad acts, arguing that the government had many other ways to prove the enterprise element. To this end, Mr. Baca and Mr. Sanchez rely on

- footnote 16 of *United States v. Watson*, 766 F.3d 1219 (10th Cir. 2014), and

44

- *Old Chief v. United States*, 519 U.S. 172 (1997).

As discussed above, footnote 16 of *Watson* suggested that probative value turns on a comparison of evidentiary alternatives. *See* p. 42, above. This footnote appears to stem from *Old Chief*, which stated that probative value under Rule 403 can "be calculated by comparing evidentiary alternatives." 519 U.S. at 184. But in *Old Chief*, the Court did not require a comparison of evidentiary alternatives. To the contrary, the Court clarified that when appealing a ruling under Rule 403, a defendant cannot satisfy the abuse-of-discretion standard through "a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." *Id.* at 183 n.7. So even if the government had an alternative way to prove an enterprise, that alternative wouldn't undermine the district court's exercise of its discretion.

*Old Chief* applies only when (1) a defendant's status as a convicted felon is an element of the charged offense and (2) a defendant offers to stipulate to that element. In *Old Chief*, the Court emphasized that the government can typically choose how to present evidence of an element even in the face of a defendant's offer to stipulate. *Id.* at 186–92. The Court recognized that a defendant's offer "to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." *Id.* at 183.

45

Though the government can ordinarily decide how to prove an element that the defendant offers to concede, the *Old Chief* Court recognized an exception involving status as a convicted felon. *Id.* at 190. Under this exception, Rule 403 generally prevents the government from presenting evidence of a felony conviction when the defendant offers to stipulate to felon status. *Id.* at 191–92. But the Court limited its holding to "proof of felon status." *Id.* at 183 n.7.

Given this limitation and the Court's general reluctance to tell the government how to prove a particular element, we've interpreted *Old Chief* to bar introduction of evidence in the face of a stipulation only when the element involves the defendant's status as a convicted felon. *See United States v. Tan*, 254 F.3d 1204, 1213 (10th Cir. 2001) ("*Old Chief* does not require the exclusion of other crimes evidence where there is a stipulation to an element of the charged crime where the evidence is offered to prove an element other than felony-convict status."). Mr. Sanchez and Mr. Baca present no case law applying *Old Chief* outside a stipulation on felon status.

The disputed element here was an enterprise, not felon status, and the Defendants never offered to stipulate to an enterprise. And other circuit courts have declined to apply *Old Chief*'s limited exception to interfere with the prosecution's choice of evidence when the defendant doesn't offer to stipulate. *E.g.*, *United States v. Gloster*, 185 F.3d 910, 913 (D.C. Cir.

46

1999); *United States v. Johnson*, 803 F.3d 279, 283 (6th Cir. 2015); *United States v. Jandreau*, 611 F.3d 922, 924 n.2 (8th Cir. 2010).

Mr. Sanchez and Mr. Baca also point to the lack of a dispute about the existence of an enterprise. Absent a dispute, the Defendants contend, the danger of unfair prejudice substantially exceeded the probative value. For this contention, Mr. Sanchez and Mr. Baca point to three opinions:

1.  *United States v. Moncayo*, 440 F. App'x 647, 654–55 (10th Cir. 2011) (unpublished), where we held that the district court had abused its discretion in admitting testimony because it was "highly prejudicial" and the probative value was "significantly diminished by the fact that [the] testimony was relevant only to an undisputed element of the case;"

2.  *United States v. Soundingsides*, 820 F.2d 1232, 1237–38 (10th Cir. 1987), where we held that the district court had abused its discretion in admitting testimony that was "highly prejudicial" and related to an issue that was not "genuinely contested;" and

3.  *United States v. Edwards*, 540 F.3d 1156, 1163–64 (10th Cir. 2008), where we held that the district court had abused its discretion in allowing the introduction of evidence of the defendant's prior convictions in part because they didn't bear on the disputed issues.

But none of these opinions applied the plain-error standard. In our view, the district court didn't commit plain error under Rule 403 when the defendant had not stipulated to the existence of an enterprise. *See United States v. Bradford*, 905 F.3d 497, 507 (7th Cir. 2018) (concluding that the district court didn't commit plain error under Rule 403 in part because the defendant hadn't offered to stipulate to the element that the prosecution was trying to prove).

47

**B.**     **The district court did not abuse its discretion in allowing introduction of evidence about Mr. Sanchez's 2005 assaults.**

Mr. Sanchez objected to the introduction of evidence involving assaults committed in 2005, and the district court overruled the objections. In overruling one of the objections, the court explained that the assault was probative as an "overt act." Supp. R. vol. 1, at 833. That overt act had to further an "enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). An "enterprise" includes "any . . . group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). And "racketeering activity" includes acts or threats involving murder and drug dealing. 18 U.S.C. §§ 1959(b)(1), 1961(1). Given these definitions, "[i]t is difficult to comprehend how one could prove the existence of an enterprise . . . without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise." *United States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997).

To prove an "enterprise engaged in racketeering activity," the government presented testimony that Mr. Sanchez had committed the assaults in 2005 based on SNM's practice of retaliating against rival gang members. *See* R. vol. 5, at 7893–94 (Mario Rodriguez), 10,952 (Eric Duran). The testimony showed the SNM's use of violence to exert power over rival gang members.

48

Mr. Sanchez challenges the relevance of the 2005 assaults, arguing that they didn't relate to racketeering activity. But the witnesses testified that the assaults had stemmed from Mr. Sanchez's affiliation with SNM and its rivalry with another gang. So the district court reasonably characterized the assaults as "overt act[s] in furtherance of the SNM enterprise." Supp. R. vol. 1, at 833. In fact, Mr. Sanchez disavows any challenge to the relevance of the 2005 assaults.

Though Mr. Sanchez challenges the relevance of the assaults, he points out that they had preceded the Molina murder by roughly 9 years. But we have rejected a categorical "rule regarding the number of years that can separate offenses." *United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir. 1983) (quoting *United States v. Engleman*, 648 F.2d 473, 479 (8th Cir. 1981)). We instead "appl[y] a reasonableness standard and examine[] the facts and circumstances of each case." *Id.*

For the VICAR charges, the government had to prove longevity of the enterprise. *See* Supp. R. vol. 1, at 575 (jury instruction). To satisfy this requirement, the government alleged that SNM had operated since the early 1980s. Count 8 of the indictment, which was later dropped, included allegations of racketeering as early as 2003. So the government could reasonably rely on evidence from 2005 to prove the enterprise element. *See United States v. Wacker*, 72 F.3d 1453, 1469 (10th Cir. 1995) (finding no error in the introduction of evidence as to bad acts taking place 6–13 years

49

earlier because the evidence showed a long-standing pattern of drug activity).

Mr. Sanchez argues that evidence of the 2005 assaults suggested that he was someone who would participate in a gang hit. Despite this suggestion, we're not conducting this balancing in the first instance. *See Sprint/United Mgt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("[Q]uestions of relevance and prejudice are for the District Court to determine in the first instance."). Our role is simply to determine whether the district court acted within its discretion. *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir. 2013).

In reviewing the district court's exercise of discretion, we give the evidence of the 2005 assaults their maximum reasonable degree of relevance and their minimum reasonable danger of unfair prejudice. *See* p. 40, above. Doing so, we conclude that the district court did not abuse its discretion.[7] *See United States v. Machado-Erazo*, 47 F.4th 721, 733 (D.C. Cir. 2018) (deciding in the first instance that evidence of the defendants' involvement in three other murders wasn't unfairly prejudicial in a VICAR trial because murder was central to the association's efforts to control members and intimidate others), *reissued* (D.C. Cir. 2022); *United States v.*

---

[7]    The government also argues that even if the district court had erred, the error would have been harmless. We need not address this argument because no error occurred.

*Millán-Machuca*, 991 F.3d 7, 25–26 (1st Cir. 2021) (concluding that the district court hadn't abused its discretion in a VICAR trial by allowing the introduction of evidence of three earlier murders committed while the defendant was in prison); *United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999) (concluding that the district court hadn't abused its discretion in allowing the introduction of evidence of other violent acts to prove the existence and scope of an enterprise under VICAR); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (concluding that the district court hadn't erred in allowing the introduction of evidence of a prior murder because the defendant's "murder business . . . [had been] part-and-parcel of his criminal enterprise").

### C. Any possible error would have been harmless when the district court allowed the introduction of evidence of Mr. Baca's commission of murder in 1989.

Mr. Baca also challenges the introduction of evidence of a 1989 murder that he had allegedly committed, arguing that

- the government had enough other evidence to prove a racketeering enterprise,

- the murder had taken place over 20 years before the plots to kill Mr. Molina and the corrections officials,

- the Defendants hadn't contested SNM's status as a racketeering enterprise, and

- the murder had suggested an improper inference of a propensity to commit violence.

51

We assume for the sake of argument that the district court had erred in allowing introduction of evidence about the 1989 murder. But even if the court had erred, the error would have been harmless.

The government bears the burden of proving harmlessness. *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007). To satisfy this burden, the government must show that the error didn't affect a substantial right. *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999). An error affects a substantial right if it had a "'substantial influence' on the outcome" or left "one in 'grave doubt' as to whether it had such effect." *Id.* (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc)).

Mr. Baca argues that the evidence played a significant role because the government had repeatedly urged admissibility of the evidence. But we can't speculate on the government's reasons for its persistence.

Regardless of the government's reasons for its persistence, the evidence occupied only a small part of the six-week trial: The government mentioned the evidence only once (when a recording was played); and in closing arguments, the government never mentioned this evidence. *See United States v. Kupfer*, 797 F.3d 1233, 1243 (10th Cir. 2015) (concluding that any error in admitting evidence was harmless because it "had played only a minor role in the trial" and the prosecutor's closing argument had contained no mention of the evidence).

Mr. Baca also argues that this evidence suggested that he had a propensity toward violence. But the jury already knew from other evidence that SNM was extraordinarily violent, that its members had committed murders, and that Mr. Baca had headed this extraordinarily violent gang. For example, multiple SNM members testified that the SNM had allowed members to get tattoos only after murdering or assaulting someone. Another member testified that SNM had engaged in "[a]nything based around violence, murder, extortion, kidnapping, assaults . . . ." R. vol. 5, at 7785. And other members testified that Mr. Baca had ordered the murder or assault of three other inmates in the 1990s and 2000s.[8]

So when the government presented evidence of the 1989 murder, the jury would not have been surprised to learn that Mr. Baca, the leader of SNM, had been involved in another murder. *See id.* at 11,588 (testimony that Mr. Baca was "jefe [head] of the organization"). Mr. Baca's attorney acknowledged the drumbeat of testimony about murders in a sidebar with the judge. The sidebar addressed a witness's accidental mention of the 1989 murder. Mr. Baca's counsel did not object, explaining that he thought that the jury had "heard about so many murders" that evidence of the 1989 murder "kind of went under the radar." *Id.* at 9787.

---

[8]    Mr. Baca doesn't question the admissibility of that testimony.

53

The government presented extensive evidence not only of SNM's violence but also of Mr. Baca's role in that violence. For the Molina murder, three individuals testified that Mr. Baca had revealed his plan for SNM members to murder Molina. Two other individuals testified that they had heard from other SNM members that Mr. Baca wanted Mr. Molina murdered. Still others testified that Mr. Baca had made other incriminating statements after the murder. For example, Timothy Martinez testified that after the Molina murder, Mr. Baca had said that prison officials had "a body" on their hands because they hadn't believed his statements about SNM's power. R. vol. 5, at 9432–35. And during the direct examination of Mr. Duran, the government presented a recording of Mr. Baca threatening to hurt family members if their relative (Jerry Armenta) were to testify for the prosecution.

The government's evidence was equally strong for the conspiracy to kill two corrections officials. An FBI agent testified that investigations had shown Mr. Baca's plan, and five SNM members testified that they had talked with Mr. Baca about this plan. R. vol. 5, at 9433 (Timothy Martinez), 10,082–83 (Robert Martinez), 10,237–50 (Roy Paul Martinez), 10,613–14, 10,630 (Jerry Montoya), 10,796–97, 10,883–87, 10,893–95, 10,921, 10,934–36 (Eric Duran). And Mr. Duran provided recordings, which corroborated his testimony that Mr. Baca had orchestrated the plan to kill the two corrections officials. "[G]iven the nature of this violence-

54

infested case, we see no reason why testimony about an additional murder would cause the jury an improper emotional reaction." *United States v. Cruz-Ramos*, 987 F.3d 27, 43 (1st Cir. 2021) (quoting *United States v. Ramirez-Rivera*, 800 F.3d 1 (1st Cir. 2015)); *see United States v. Piette*, 45 F.4th 1142, 1158 (10th Cir. 2022) (concluding that any error in allowing the introduction of testimony as to the defendant's prior act of molestation was harmless because the testimony had "occupied only a few moments in a weeklong trial packed with graphic, disturbing evidence of [the defendant's] behavior" and "pale[d] in comparison to the breadth, depth, and detail of the remaining sexual molestation evidence the jury heard in th[e] case").

\* \* \*

We conclude that (1) the district court did not err in allowing evidence of the 2005 assaults and (2) any error in allowing evidence of the 1989 murder would have been harmless.

**4.    Defendants Sanchez and Herrera: The district court did not err in declining to sever Counts 6–7.**

Mr. Sanchez and Mr. Herrera argue that the district court erred in refusing to sever Counts 6–7 (the murder of Molina) from Counts 9–10 (the conspiracy to murder the two corrections officials).[9] This argument

---

[9]    The first trial was supposed to cover Counts 6–12. But the other counts in the first trial were dismissed. After the evidence closed, the

implicates Federal Rule of Criminal Procedure 14, which allows the district court to break the counts into separate trials.

Mr. Sanchez and Mr. Herrera invoke not only Rule 14 but also Federal Rules of Evidence 403 and 404(b), arguing that

- evidence about Mr. Baca's involvement in the conspiracy to kill the corrections officials (Counts 9–10) was inadmissible against Mr. Sanchez and Mr. Herrera (who had been charged in Counts 6 and 7 only for their roles in the Molina murder) and

- the inadmissible evidence created unfair prejudice.

We reject these arguments. The district court did not abuse its discretion in allowing evidence as to Mr. Baca's involvement in the conspiracy to kill the corrections officials. Mr. Sanchez and Mr. Herrera failed to show that this evidence had constituted unfairly prejudicial and improper character propensity evidence. So the district court did not abuse its discretion in declining to sever Counts 6–7.

### A.     The district court did not violate Rules 403 and 404(b) in allowing the introduction of evidence as to the conspiracy to kill the corrections officials.

At the trial, the district court allowed the introduction of evidence implicating Mr. Baca in the conspiracy to kill the corrections officials

---

district court granted Mr. Baca's oral motion for a judgment of acquittal on Count 8. *See* R. vol. 5, at 11,691, 12,105–106; ECF Doc. 1870, at 7. And the government dismissed Counts 11 and 12 after defendant Christopher Garcia had entered into a plea agreement.

56

(Counts 9–10). But the government did not allege that Mr. Sanchez or Mr. Herrera had participated in this conspiracy.

Even though the evidence didn't involve Mr. Sanchez or Mr. Herrera, they argue that the district court should have excluded the evidence because it

- had little probative value in showing a racketeering enterprise in light of alternative evidence of an enterprise and a lack of dispute as to the enterprise element and

- could result in unfair prejudice.

The government counters that

- Mr. Herrera and Mr. Sanchez partially forfeited their appellate arguments and

- the conspiracy evidence was properly admitted.

We conclude that Mr. Herrera and Mr. Sanchez generally preserved their appellate arguments as to Rules 403 and 404. But the district court acted within its discretion in allowing the introduction of this evidence.

**(1)    Mr. Sanchez and Mr. Herrera generally preserved their arguments on probative value.**

The government argues that

- Mr. Sanchez forfeited his challenge to the probative value based on alternative evidence of an enterprise and

- Mr. Herrera broadly forfeited his Rule 403 argument.

We disagree. Mr. Sanchez and Mr. Herrera preserved these two arguments, but waived their argument that they hadn't disputed the availability of an enterprise.

The government argues that Mr. Sanchez forfeited his challenge to the probative value based on the other evidence of a racketeering enterprise. We disagree: In district court, Mr. Sanchez argued that the government had other ways to prove a racketeering enterprise, such as evidence of drug trafficking, that would avoid the unfair prejudice from evidence of the plot to kill corrections officials. This argument had alerted the district court to the substance of Mr. Sanchez's argument that he later made in the appeal. *See United States v. McIntosh*, 29 F.4th 648, 654–55 (10th Cir. 2022) ("Though his appellate briefs may be more detailed than his motion to withdraw the plea, [the defendant's] arguments below nonetheless gave the district court ample opportunity to consider these issues."). So Mr. Sanchez did not forfeit this argument.

The government also argues that Mr. Herrera forfeited a Rule 403 challenge because he did not join Mr. Sanchez's motion to sever Counts 6–7. But Mr. Herrera joined Mr. Sanchez's renewed motion to sever, and that motion had incorporated Mr. Sanchez's motion for severance. Before joining Mr. Sanchez's motion, Mr. Herrera had joined another motion to sever Counts 6–7. That motion relied in part on Rule 403 when contesting the admissibility of evidence involving the conspiracies to kill the

corrections officials. So Mr. Herrera did preserve his argument on Rule 403.

Though Mr. Sanchez and Mr. Herrera preserved these arguments, none of the defendants preserved an argument that they hadn't disputed a racketeering enterprise. *See* Part 3(A)(2), above. Given the failure to preserve this argument, we would ordinarily apply the plain-error standard. *See id.* But the Defendants don't argue plain error, so we won't consider the argument. *Id.*

### (2)     The district court did not abuse its discretion in applying Rule 404(b).

Because Mr. Sanchez and Mr. Herrera preserved their other arguments invoking Rule 404(b), we apply the abuse-of-discretion standard. *United States v. Hardwell*, 80 F.3d 1471, 1488 (10th Cir. 1996). Applying this standard, we uphold the rulings as to Rule 404(b).

Rule 404(b) requires exclusion of evidence involving prior bad acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). These examples are "illustrative, not exhaustive," and the rule favors admission of "all other-act evidence except that tending to prove *only*

59

propensity." *United States v. Armajo*, 38 F. 4th 80, 84 (10th Cir. 2022) (emphasis added).

Mr. Sanchez and Mr. Herrera argue that the evidence improperly suggested

- Mr. Baca's propensity for violence and

- the propensity of Mr. Herrera and Mr. Sanchez to comply with an order to murder Mr. Molina.

But the district court found the evidence probative for three other purposes:

1.  to show that Mr. Baca and others could plot murders from prison,

2.  to show that SNM members could transmit messages and orders among themselves even while in prison, and

3.  to show that SNM was an enterprise engaged in racketeering activity.

R. vol. 1, at 1257–58. Mr. Sanchez and Mr. Herrera don't question the relevance for these purposes, and all of them would be permissible. *See* Fed. R. Crim. P. 404(b)(2).

**(3)    The district court did not abuse its discretion in applying Rule 403.**

We apply the abuse-of-discretion standard when reviewing the district court's application of Rule 403. *See United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013). Under Rule 403, a district court could "exclude relevant evidence if its probative value is substantially

outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. On appeal, we do not balance the probative value against the risk of unfair prejudice in the first instance. *See* p. 40, above. Rather, we give the evidence its "maximum reasonable probative force and its minimum reasonable prejudicial value." *See* p. 40, above (quoting *United States v. Tee*, 881 F.3d 1258, 1273 (10th Cir. 2018)). Giving the evidence its maximum reasonable probative force and minimum reasonable prejudicial value, we conclude that the district court acted within its discretion.

The district court decided not to exclude this evidence based largely on the temporal proximity of (1) the conspiracy to kill the two corrections officials and (2) the murder of Mr. Molina. The court reasoned that the evidence of a conspiracy to kill the corrections officials had shown

- racketeering activities around the same time as the Molina murder and

- the ability of Mr. Baca and others to transmit orders to other prisoners.

R. vol. 1, at 1257–58.

Mr. Sanchez and Mr. Herrera challenge the second rationale, denying a dispute over the ability of SNM members to communicate with each other in prison. These defendants waived this argument. *See* p. 59, above.

Mr. Sanchez and Mr. Herrera also downplay the probative value of the conspiracy evidence because the government could have used other enterprise evidence. But the district court could assign at least some

61

probative value to the evidence even if the government had other ways to prove an enterprise. *See* pp. 45–47, above.

Mr. Herrera also challenges the district court's emphasis on the superior probative value of the evidence relating to Mr. Baca's role in the conspiracy to kill the corrections officials, relying on a distinction between Mr. Baca's alleged orders to murder Mr. Molina and the two corrections officials. In the Molina plot, Mr. Baca allegedly instructed other inmates; in the plot against the corrections officials, Mr. Baca allegedly instructed individuals outside the prison. This difference, Mr. Herrera argues, diminished the probative value of the evidence.

But the district court focused on Mr. Baca's ability to issue instructions from within the prison, which was the same for both plots. This focus supplied a reasonable perspective, allowing the district court to view both plots as highly probative of Mr. Baca's ability to issue orders from within a prison.

Regardless of the probative value, Mr. Sanchez and Mr. Herrera argue that the conspiracy evidence sparked unfair prejudice by

- creating adverse inferences about Mr. Baca's character and power over SNM members down the chain of command, which in turn suggested that Mr. Sanchez and Mr. Herrera would have complied with Mr. Baca's order to murder Molina; and

- infusing sensationalism because the evidence concerned a plot to assassinate state officials.

The district court rejected the first argument, reasoning that

62

- the evidence didn't constitute "character evidence" because it related to Mr. Baca's tendency to engage in particular actions (orchestrating murder and enforcing gang rules through violent acts) rather than his general traits (character for violence or ruthlessness) and

- the jury was likely to interpret the evidence to reflect the SNM's code of violently punishing disobedience rather than character traits of SNM members.

R. vol. 1, at 1258–59.

This reasoning fell within the district court's broad realm of discretion. The court could reasonably conclude that evidence of Mr. Baca's orders in the plot against the corrections officials hadn't involved improper inferences about character. In fact, Mr. Sanchez and Mr. Herrera acknowledge that the facts surrounding the Molina murder had differed from the facts involving the plot against the corrections officials. And Mr. Sanchez and Mr. Herrera weren't implicated in the plot against the corrections officials. So the district court could reasonably conclude that the evidence of that plot wouldn't have suggested a propensity for Mr. Sanchez or Mr. Herrera to commit murder.

Nor did the district court need to exclude the evidence based on its sensationalist quality. The district court could reasonably regard the conspiracy to murder corrections officials as an act of defiance, designed to enhance SNM's reputation and power. The sensationalism of that evidence didn't necessarily trump its probative value.

\* \* \*

63

We find no abuse of discretion when maximizing the reasonable probative value of the evidence and minimizing the reasonable danger of unfair prejudice. *See* pp. 40, 50, above.

**B.    Rule 14 did not require severance.**

Mr. Sanchez and Mr. Herrera also invoke Rule 14, which allows the district court to order separate trials for the different counts. Fed. R. Crim. P. 14(a). Under this rule, Mr. Sanchez and Mr. Herrera argue that the district court should have severed Counts 6–7 to avoid the unfair prejudice from evidence involving the plot to kill the corrections officials (Counts 9–10). In our view, however, the district court had the discretion to reject this argument.

We usually prefer district courts to conduct joint trials of defendants who are charged together. *United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir. 1995). An exception exists when a party shows actual prejudice outweighing the expense and inconvenience of separate trials. *United States v. Thomas*, 849 F.3d 906, 911–12 (10th Cir. 2017). "It is not enough to show that separate trials may have afforded a better chance of acquittal." *Id.* at 912. To the contrary, the party proposing severance "must show the right to a fair trial is threatened or actually impaired." *Id.*

In considering this burden, the district court concluded that Mr. Sanchez and Mr. Herrera hadn't justified severance of the counts. In reviewing this conclusion, we apply the abuse-of-discretion standard,

recognizing that "the defendant's task in overturning such a decision is difficult." *Id.* at 911.

Trying to satisfy this burden, Mr. Sanchez and Mr. Herrera urge actual prejudice from the evidence of a conspiracy to kill the correction officials. But we have concluded that the district court had the discretion to regard the conspiracy evidence as

- admissible under Rules 403 and 404(b),

- probative of the existence of an enterprise and the ability to communicate within the prison system, and

- no more inflammatory than the evidence involving the Molina murder.

*See* Part 4(A)(2)–(3), above.

Mr. Sanchez and Mr. Herrera rely heavily on an out-of-circuit opinion, *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012). There the Fifth Circuit concluded that the district court had abused its discretion in denying severance. *Id.* at 828.

In *McRae*, the party seeking severance was a police officer charged with 2 counts in an 11-count indictment. *Id.* at 810–11, 816. One of the counts involved excessive force; the other count involved carrying, using, and discharging a firearm in furtherance of a felony crime of violence resulting in a death. *Id.* at 810–11. Other defendants faced additional charges involving seizure of a car and burning of a body. *Id.* at 824. The

65

Fifth Circuit concluded that the joint trial had created actual prejudice because of

- the highly inflammatory nature of the charges and evidence involving the codefendants' seizure of a car and burning of a body,

- the incrimination of the defendant through evidence admissible only against the codefendants, and

- the marginal relationship and dissimilarities between the charges and evidence against the defendants.

*Id.* at 826–28.

The Fifth Circuit's opinion provides little guidance here in three respects.

First, the district court could reasonably conclude that the evidence about the corrections officials wasn't particularly inflammatory against Mr. Sanchez or Mr. Herrera. *See* Part 4(A)(3), above.

Second, Mr. Sanchez and Mr. Herrera were implicated only in the Molina murder, not the plot to kill the corrections officials. And the *McRae* court clarified that "the mere presence of a spillover effect does not ordinarily warrant severance." *McRae*, 702 F.23d at 827 (quoting *United States v. McCord*, 33 F.3d 1434, 1452 (5th Cir. 1994)).

Third, the charges against Mr. Sanchez and Mr. Herrera (Counts 6–7) bore reasonable similarities to the charges against Mr. Baca (Counts 6–7 and 9–10). For example, all of the charges arose from VICAR and entailed overt acts of violence committed in furtherance of SNM as a racketeering

66

enterprise. In contrast, the additional defendants in *McRae* faced additional charges under separate statutes.

Given these distinctions with *McRae*, the Fifth Circuit's analysis doesn't suggest unfair prejudice from joinder of the counts involving the conspiracy against the corrections officials. And even if the joinder had created a risk of unfair prejudice, the district court issued many limiting instructions.[10] And at the end of the case, the court instructed the jury to "separately consider the evidence against [the individual defendants] and return a separate verdict for each as to each crime charged." Supp. R. vol. 1, at 592. We have regarded such instructions as enough to curtail prejudice. *E.g., United States v. Wardell*, 591 F.3d 1279, 1301 (10th Cir. 2009); *United States v. Hutchinson*, 573 F.3d 1011, 1030–31 (10th Cir. 2009).

Despite the district court's instructions, Mr. Sanchez and Mr. Herrera urge prejudice based on

- the government's evidence of an enterprise that "blurred any distinguishing lines between the counts or defendants,"

- the large number of limiting instructions, and

- the use of the same verdict form for all of the defendants.

---

[10]    Mr. Herrera puts the number at roughly 70. Mr. Sanchez counts at least 124 limiting instructions. *See* p. 89, below.

In our view, however, the district court acted within its discretion in handling the government's evidence of an enterprise, the large number of limiting instructions, and the use of the same verdict form for the defendants.

The Ninth Circuit addressed a similar combination of circumstances and upheld the denial of severance in *United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993), *overr'd in part on other grounds*, *United States v. Norby*, 225 F.3d 1053, 1059 (9th Cir. 2000), *overr'd in part on other grounds*, *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002) (en banc). Though the trial here lasted roughly 6 *weeks*, the trial in *Baker* had lasted over 16 *months*. *Id.* at 1386. Over the course of 16+ months, the parties in *Baker* presented evidence of over 2000 drug transactions over 11 years. *Id.*

In *Baker*, the defendants argued that the district court should have severed the trial. *Id.* at 1387–89. Like the defendants here, the *Baker* defendants argued that the court had given too many limiting instructions (nearly 200 in that case). *Id.* at 1388. The Ninth Circuit disagreed, following its regular assumption that jurors follow the instructions. *Id.* Based on that assumption, the Ninth Circuit concluded that the "careful and frequent limiting instructions militate[d] against finding an abuse of discretion." *Id.*

The Ninth Circuit recognized that "the jury had to evaluate a tremendous amount of evidence." *Id.* (quoting *United States v. Casamento*,

68

887 F.2d 1141, 1150 (2d Cir. 1989)). Despite the volume of evidence, the court observed that the "legal concepts" were relatively straightforward, drawing a contrast with complex antitrust cases involving "abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae." *Id.* (quoting *Casamento*, 887 F.2d at 1150). The *Baker* court considered the legal concepts involving large-scale drug dealing as within the competence of ordinary jurors. *Id.* Here too, the pertinent legal concepts involve murder, which is "rather ordinary in nature, except in [its] viciousness." *Id.* (quoting *United States v. DiNome*, 954 F.2d 839, 842 (2d Cir. 1993)).

Along with the simplicity of the legal concepts and the near-200 limiting instructions, the *Baker* court pointed to the jury's

- selective verdicts (acquittal of some defendants on several counts and inability to reach a verdict as to other defendants) and

- identification of a flaw in the indictment.

*Id.* To the Ninth Circuit, the jury's actions reflected "conscientious attention to each count as it applied to each defendant." *Id.* Here too, the verdict was selective, with the jury acquitting Mr. Perez on all counts. *See* p. 9 n.2, above.

Mr. Sanchez downplays this acquittal, asserting that the government had presented no evidence against Mr. Perez. But some inmates testified that Mr. Perez had acknowledged participating in the Molina murder by

giving a shank from his walker to Mr. Sanchez and Mr. Rodriguez. Irrespective of the strength of the evidence against Mr. Perez, however, the district court could reasonably consider his acquittal as proof of the jury's ability to separately consider the evidence as to each defendant. *See United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) (upholding the denial of a motion to sever based partly on the acquittal of one defendant on one count, reasoning that the partial acquittal provided "extra confidence" that the district court hadn't abused its discretion).[11]

Mr. Sanchez and Mr. Herrera also urge prejudice from the jury's use of a single verdict form for all four defendants. For prejudice, Mr. Sanchez and Mr. Herrera rely on *Kansas v. Carr*, 577 U.S. 108 (2016), where the Supreme Court found no error in a joint trial because the district court had (1) instructed the jury to separately consider the guilt of each defendant and use a separate verdict form for each one and (2) given defendant-specific instructions for aggravating and mitigating circumstances. *Id.* at 124. But the Supreme Court did not say that use of the same verdict form would have suggested prejudice. In fact, the district court here also

---

[11]    Downplaying Mr. Perez's acquittal, Mr. Sanchez points out that he isn't arguing that the jury assessed culpability on a group-wide basis. But the district court issued extensive limiting instructions for the jury to compartmentalize the evidence against each defendant. So Mr. Sanchez's argument focuses on the jury's inability to follow those instructions. Mr. Perez's acquittal suggests that the jury could follow the instructions by compartmentalizing the evidence against each defendant.

instructed the jury to separately (1) consider the evidence against each defendant and (2) assess the guilt of each defendant. In our view, the use of a single verdict form didn't strip the court of its discretion to conduct a joint trial.

With little risk of unfair prejudice, the combination of counts promoted judicial economy. Mr. Baca was charged with conspiracies to murder Mr. Molina (Counts 6–7) and two corrections officials (Counts 9–10). Given these charges, the district court expressed concern that severance of Counts 6–7 would create inefficiencies, requiring the government to duplicate evidence in separate trials. The district court acted reasonably in concluding that the interest in efficiency had outweighed the risk of prejudice to Mr. Sanchez or Mr. Herrera. So we find no abuse of discretion in the denial of a severance.

\* \* \*

We uphold the district court's

- decision to allow the introduction of evidence involving Counts 9–10 at a joint trial and the

- refusal to sever Counts 6–7.

5.    **Defendants Sanchez and Baca: The district court did not abuse its discretion in declining to sever the Defendants' trials.**

Mr. Sanchez and Mr. Baca also assert error in refusing to sever their trials, alleging prejudice from the use of out-of-court statements by other

71

codefendants, many of which were recorded.[12] We reject this assertion for procedural and substantive reasons. Procedurally, Mr. Sanchez and Mr. Baca waived the issue by failing to file a pretrial motion for severance of defendants. And substantively, the district court had the discretion to deny severance.

### A.    The codefendants' out-of-court statements didn't require severance.

Mr. Sanchez and Mr. Baca argue that the district court erred in disallowing separate trials for each defendant. According to Mr. Sanchez and Mr. Baca, separate trials were necessary to avoid prejudice from the government's use of statements by the codefendants.

Many of those statements consist of recordings of government witnesses. Before trial, the government redacted names from those recordings to conceal the identities of defendants other than the declarants.

Despite the redactions, Mr. Sanchez and Mr. Baca argue that the recordings were probative of their own guilt but admissible only as to

---

[12]    In arguing that the district court should have severed defendants, Mr. Sanchez draws on Mr. Herrera's argument as to severance of counts. For severance of counts, Mr. Herrera focuses on the prejudice from evidence implicating Mr. Baca in Counts 9–10 (conspiracy to murder the corrections officials). But we have elsewhere rejected Mr. Sanchez's challenges as to the admissibility of that evidence. *See* Parts 3–4(A), above. So we need not further consider any alleged prejudice from that evidence.

other parties. We conclude that (1) Mr. Sanchez and Mr. Baca waived the issue and (2) the district court acted within its discretion.

**(1)    Mr. Sanchez and Mr. Baca waived the issue involving severance of defendants based on the out-of-court statements.**

A party must file a pretrial motion when seeking severance of defendants. Fed. R. Crim. P. 12(b)(3)(D). If the party doesn't file a pretrial motion, the district court considers severance waived unless the party shows good cause. Fed. R. Crim. P. 12(c)(3); *see United States v. Vance*, 893 F.3d 763, 769 (10th Cir. 2018) ("Failure to comply with the timeliness requirement set out in Rule 12 constitutes a waiver." (quoting *United States v. Burke*, 633 F.3d 984, 987–88 (10th Cir. 2011))).[13]

Mr. Sanchez and Mr. Baca didn't file a pretrial motion to sever defendants. Because Mr. Sanchez and Mr. Baca made no showing of good cause, they waived their appellate argument for severance.[14]

---

[13]    Mr. Sanchez argues that he satisfied Federal Rule of Criminal Procedure 51's requirement for preserving a claim of error. Even if he had complied with Rule 51, he would also have needed to comply with Rule 12 by filing a pretrial motion to sever the defendants.

[14]    Mr. Sanchez argues that Rule 12 does not apply because this case involves forfeiture, not timeliness. But we regard an argument as untimely under Rule 12 when a defendant makes a new argument on appeal. *See United States v. Vance*, 893 F.3d 763, 769 (10th Cir. 2018). And an untimely argument under Rule 12 is waived rather than forfeited. *Id.*

73

**(2)    Mr. Sanchez and Mr. Baca failed to timely file pretrial motions to sever the case as to the defendants.**

The Defendants did file pretrial motions to sever *counts*. But those motions did not address severance of *defendants*. So these motions didn't preserve an argument to sever defendants. *See United States v. Mann*, 161 F.3d 840, 861 n.58 (5th Cir. 1998) (distinguishing motions for severance of offenses and defendants for purposes of preservation); *United States v. States*, 652 F.3d 734, 742–43 (7th Cir. 2011) (finding waiver of an argument for severance of charges when the defendant moved only to sever defendants).

Mr. Sanchez (joined by Mr. Baca) also filed a motion in limine and a supplemental memorandum to exclude the out-of-court statements by other codefendants. In oral argument, Mr. Sanchez characterizes these filings as pretrial motions to sever the case as to the defendants. We disagree for two reasons.

First, the filings did not ask the district court to sever Mr. Sanchez from a trial with Mr. Herrera.[15] Elsewhere, the motion in limine argued that due process would require either exclusion of hearsay as to any defendant

---

[15]    Mr. Sanchez asked the district court to exclude any inadmissible statements, "*sever Mr. Sanchez's trial from the trial of defendants Perez, Baca, and Garcia*," or provide some other remedy. R. vol. 1, at 1288–89 (emphasis added). The motion in limine lacked a request to sever Mr. Sanchez's trial from Mr. Herrera's.

74

or "a severance of *Counts*." R. vol. 1, at 1288 (emphasis added). The supplemental memorandum requested exclusion of out-of-court statements or severance of "*the trial of Counts 6–7* in such a way that [the district court would not be] in the position of instructing the jurors to perform a 'mental gymnastic, beyond not only their powers, but anyone else's.'" *Id.* at 1429 (quoting *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932)) (emphasis added). Nowhere in the motion in limine or supplemental memorandum was there a request for the court to separately try Mr. Sanchez or Mr. Baca.

Second, Mr. Sanchez did not invoke Rule 14 in his motion in limine. Granted, the motion in limine cited a Supreme Court opinion, which in turn had discussed the purpose of an amendment to Rule 14. *Id.* at 1288 (quoting *Bruton v. United States*, 391 U.S. 123, 130–32 (1968)). But that discussion focused on the Sixth Amendment's Confrontation Clause, which is not raised here. *Id.*

As a result, the district court ruled on the motion in limine without addressing Rule 14 or severance of defendants. The lack of a ruling shows that the motion in limine did not alert the district court to an issue involving Rule 14 or severance of defendants.

Even if we were to treat the motion in limine as a pretrial motion to sever the parties,[16] the Defendants' argument wouldn't have been timely or sufficient under Rule 12. The deadline for pretrial motions under Rule 12 was October 6, 2017. Mr. Sanchez moved in limine over three months later, days before the trial was to begin. So the motion in limine would have been untimely as a pretrial motion.

Even if we were to overlook the delay, Mr. Sanchez's appellate argument differs from his argument in district court. *See* 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 103.12[3] (Joseph M. McLaughlin ed., 2d ed. 2006) ("The right to claim error on appeal is not preserved . . . if the objection [below] is based on a different ground than the argument on appeal."). There he relied on the Fifth and Sixth Amendments, not Rule 14. Here, though, Mr. Sanchez and

---

[16]    A motion in limine may preserve an objection only when the issue "(1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre–trial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. McVeigh*, 153 F.3d 1166, 1200 (10th Cir. 1998) (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 986–88 (10th Cir. 1993)); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995) (using this standard when discussing the possibility of treating a motion to sever as a motion in limine).

The first and third requirements were not met. For the first requirement, the motion in limine did not expressly invoke Rule 14 or ask the court to exercise discretion to sever. *See* pp. 77–78, below. For the third requirement, the district court did not decide whether to sever Mr. Sanchez's trial from Mr. Herrera's.

Mr. Baca focus on the court's discretion to order a severance under Rule 14 and *Zafiro v. United States*, 506 U.S. 534 (1993)—not the Fifth or Sixth Amendment. *See Corbett v. Bordenkircher*, 615 F.2d 722, 724 (6th Cir. 1980) (distinguishing between arguments for severance of counts based on procedural rules and arguments for severance based on the right to due process).

Mr. Sanchez asserts that

- he did not need to invoke Rule 14 because it just codifies the court's discretion to avoid unfair prejudice by severing the case and

- the Fifth Amendment argument was rhetorical, "subsum[ing] . . . [the contention] that severance or some equivalent remedy should be granted in the interests of fairness."

Sanchez's Reply Br. at 4–5. These assertions assume that the Defendants had asked the district court to sever the defendants based on Rule 14 or *Zafiro*. But the Defendants hadn't made such an argument in district court. There they had urged exclusion of their codefendants' out-of-court statements, not severance of counts.

Mr. Sanchez points to *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995), arguing that it had treated a Fifth Amendment severance argument as an argument under Rule 14. But in *Breinig*, the defendant had moved for severance and requested a separate trial under Rule 14. *Id.* at 851. Mr. Sanchez and Mr. Baca never presented a similar motion or argument in district court. So *Breinig* is distinguishable.

77

The Defendants also argue that they preserved the issue by opposing the government's motion to reconsider a plan to empanel two juries. We disagree.

In opposing the government's motion, the Defendants stated in district court that

- they "continue to argue that the proper remedy is for the Court to sever Counts 6–7 from Counts 8–12" and

- severance was appropriate "given the evidence as to Defendants Perez and Herrera, and the Government's ongoing disclosure of evidence that is not admissible as to all Defendants."

Supp. R. vol. 2, at 491. We don't know what the Defendants meant by "sever[ing] the individual Defendants," and the sentence included no authority or explanation. This unexplained, unsupported sentence did not fairly alert the district court to a distinct argument for severance of defendants. *See Tele-Commc'ns, Inc. v. Comm'r.*, 104 F.3d 1229, 1233–34 (10th Cir. 1997) (considering an issue forfeited when a brief to the tax court had "contain[ed] only a single paragraph addressing the issue" and the appellate contention consisted of "ten pages of argument, replete with examples and citations").

Regardless of the content, however, the Defendants' response would not have been timely as a pretrial motion under Rule 12. The scheduling order imposed a deadline of October 6, 2017, and the Defendants filed this opposition brief over three months later—the day before the trial was to

start. So the opposition brief wouldn't have satisfied Rule 12 as a timely

motion for severance of defendants.[17]

**(3)    The district court did not raise the issue.**

Mr. Sanchez and Mr. Baca also contend that the district court raised

the issue involving severance of defendants. For this contention, Mr.

Sanchez and Mr. Baca point to the district court's

- pretrial statement when responding to the motion in limine and

- proposal of a two-jury plan.

We reject this contention.

---

[17]    Mr. Sanchez also renewed his motion for severance during the fifth week of the trial. R. vol. 5, at 11,755–58. Mr. Sanchez clarified that the "request [was] basically [for] a mistrial . . . and a de facto severance based on that." *Id.* at 11,758. For this motion, Mr. Sanchez

- reasserted his constitutional arguments against the admission of the recordings in his motion in limine and supplemental memorandum and

- pointed to Mr. Cordova's references to Mr. Sanchez during the trial.

But Mr. Sanchez needed to file a pretrial motion "if the basis for the motion [was] then reasonably available and the motion [could] be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Mr. Sanchez could reasonably expect the government to use Mr. Cordova's testimony about Mr. Perez's out-of-court statements. In fact, the Defendants moved before trial for exclusion of Mr. Cordova's testimony about Mr. Perez's out-of-court statements. R. vol. 1, at 1277–78. So Mr. Sanchez had enough information before the trial to seek severance of the defendants. Despite that information, Mr. Sanchez failed to file a pretrial motion for severance of the defendants, waiving the issue. *See* Part 5(A)(1)–(4), above.

At a pretrial hearing, the district court stated that it did not see a constitutional issue in Mr. Sanchez's motion in limine. The court stated that (1) the only issue involved hearsay and (2) a limiting instruction would provide an adequate remedy. These statements did not refer to severance or Rule 14.

The week before trial, the district court expressed concern about the number of limiting instructions and the out-of-court statements in the recordings. Given these concerns, the court proposed empaneling two juries: one for Mr. Baca and Mr. Sanchez, and another for Mr. Herrera and Mr. Perez. Mr. Sanchez argues that the two-jury plan preserved an argument under Rule 14 to sever defendants.

But in response to the two-jury plan, the Defendants continued to urge severance of Counts 6–7. Despite urging severance of counts, the Defendants

- declined to seek a separate trial for Mr. Baca and

- expressed logistical concern about the empaneling of two juries.

Given these expressions of concern, the district court had little reason to think that Mr. Sanchez and Mr. Baca *wanted* further separation of trials or juries.

* * *

80

We thus conclude that Mr. Sanchez and Mr. Baca did not file a timely pretrial motion to sever the defendants.

**(4)    Without good cause, Mr. Sanchez and Mr. Baca waived their arguments under Rule 14 for severance of defendants based on the recorded statements.**

For the recordings, Mr. Sanchez and Mr. Baca lacked good cause to forgo a pretrial motion for severance. So the Defendants waived their argument as to the recordings.

For the recordings, Mr. Sanchez and Mr. Baca had ample opportunities to file a pretrial motion; and they did not seek severance of *defendants*. Despite these missed opportunities, Mr. Sanchez and Mr. Baca haven't alleged good cause; so they've waived their appellate argument for severance. *See United States v. White*, 584 F.3d 935, 949 (10th Cir. 2009).

Our caselaw has evolved on waiver under Rule 12. Granted, we have sometimes reviewed an unpreserved issue of severance for plain error. *See, e.g.*, *United States v. Jones*, 530 F.3d 1292, 1298 (10th Cir. 2008); *United States v. Iiland*, 254 F.3d 1264, 1269 (10th Cir. 2001). But after these opinions, we clarified in *United States v. Bowline* that we will not conduct plain-error review for "an untimely Rule 12 argument" in the absence of

81

good cause. *United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019).[18]

Even if we were to allow plain-error review, Mr. Sanchez and Mr. Baca have not requested review for plain error. And we typically decline to consider the possibility of plain error when no one has asks us to consider the possibility. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019); *see* p. 26, above. We thus conclude that the Defendants waived their argument for severance based on the recordings.

**(5)   Even without a waiver, the district court would not have erred when declining to sever the case as to the defendants.**

Even if we put aside the waiver, we'd reject the Defendants' challenge.

"[I]n a conspiracy trial it is preferred that persons charged together be tried together." *United States v. Scott*, 37 F.3d 1564, 1579 (10th Cir. 1994). Despite this preference, the district court can sever the trial to avoid prejudice. Fed. R. Crim. P. 14; *Zafiro v. United States*, 506 U.S. 534, 537–38 (1993). But "Rule 14 leaves the determination of risk of prejudice

---

[18]    There we relied on *Davis v. United States*, 411 U.S. 233 (1973), which had established that "an untimely argument subject to Rule 12 is not reviewable either in district court or in any subsequent proceedings absent a showing of an excuse for being untimely." *United States v. Bowline*, 917 F.3d 1227, 1234 (10th Cir. 2019). In *Bowline*, we also criticized the willingness of some other circuits to conduct plain-error review when the appellant hadn't preserved the argument under Rule 12. *Id.* at 1237.

and any remedy for such prejudice to the sound discretion of the district court." *United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997) (citing *Zafiro*, 506 U.S. at 541).

Given this discretion, a defendant "seeking to vacate a conviction based upon the denial of a motion to sever faces a steep challenge." *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013) (quoting *United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009)). To obtain reversal of an order denying severance of defendants, a party must show

- actual prejudice outweighing the expense and inconvenience of separate trials and

- inadequacy of less drastic means to cure potential prejudice (like limiting instructions).

*United States v. Hutchinson*, 573 F.3d 1011, 1025–27 (10th Cir. 2009).

### (a) The district court did not err in declining to sever the defendants based on the government's recordings.

Mr. Sanchez and Mr. Baca rely mainly on prejudice from the use of recordings of statements made by codefendants.

### (i) Mr. Sanchez and Mr. Baca had not shown actual prejudice.

Actual prejudice exists only if the Defendants have shown "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. A district court must "weigh the prejudice to a particular defendant caused by joinder against the obviously

83

important considerations of economy and expedition in judicial administration." *United States v. Jones*, 530 F.3d 1292, 1304 (10th Cir. 2008) (quoting *Pursley*, 474 F.3d at 765).

Mr. Sanchez and Mr. Baca argue that the recordings caused actual prejudice because the statements were probative of their guilt but inadmissible against them. The recordings did not directly implicate Mr. Sanchez or Mr. Baca, but did undermine their

- attribution of the Molina murder to impulsiveness rather than planning and

- denial of the alleged "paperwork."

The recordings also bolstered the credibility of government witnesses who had been impeached.

"Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). But severance is not always required when inadmissible evidence is probative of guilt. For example, severance may be avoidable through limiting instructions. *See United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994) (noting that limiting instructions could cure the prejudice caused by a phone call that implicated the defendants but was inadmissible against them). Or a mixed verdict might dispel worries about prejudice. *See United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997) (concluding that

84

an inability to reach a verdict on one count could show mitigation of prejudice from the introduction of inadmissible evidence). Mr. Sanchez and Mr. Baca point to no precedent compelling severance whenever the court allows the use of probative evidence that is admissible only as to other defendants.

Instead, Mr. Sanchez cites four out-of-circuit opinions, where other courts have found an abuse of discretion in denying severance:

- *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996)

- *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012)

- *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991)

- *United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019)

Those opinions do not bind us and are distinguishable.

In *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996), for example, the Eighth Circuit reversed the denial of severance because (1) the charges facing the defendant differed from the charges against his codefendants, (2) most of the trial evidence was admissible only against a single codefendant, and (3) that evidence was "highly inflammatory." *Id.* at 335.

Similarly in *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012), the Fifth Circuit required severance based on the allowance of inadmissible and probative evidence when the government's case consisted mainly of evidence against the codefendants, who were facing charges involving a more violent conspiracy. *Id.* at 824; *see* pp. 65–66, above.

*Baker* and *McRae* differ from our case because the district court could reasonably view the inadmissible recordings here as relatively inconsequential to Mr. Sanchez or Mr. Herrera. And all of the defendants faced charges involving a conspiracy to murder Mr. Molina (Counts 6–7).

Mr. Sanchez asserts in oral argument that the other two cited cases involve defendants participating in a single conspiracy: *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991), and *United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019). But those opinions also present different facts.

For example, in *Davidson*, the Sixth Circuit found a strong showing of prejudice when

- the defendant has been charged with only one count and

- his codefendant had been charged in ten other counts.

936 F.2d at 861. The evidence against the codefendant included an amended tax return that was both probative of the defendant's guilt and inadmissible against the defendant. *Id.* But in our case, the redacted recording occupied only a small part of the trial and did not directly implicate the Defendants.

The facts also differed in *United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019). There the district court had conducted a joint trial, and the defendant's wife presented inadmissible and probative testimony against the defendant. *Id.* at 126. Although the alleged conspiracy involved both

86

the husband and wife, the case involved highly inflammatory testimony and spousal privilege. *Id.* at 126–27.

Granted, use of the recordings here prevented cross-examination of the declarants. But the redactions softened any prejudicial impact. *See United States v. Parker*, 241 F.3d 1114, 1117 (9th Cir. 2001) (upholding the introduction of a recording in part because redactions had softened the potential prejudice to the defendant). And the recordings just corroborated what was already considered admissible for all of the defendants. *See United States v. Sarracino*, 340 F.3d 1148, 1165 (10th Cir. 2003) (declining to find actual prejudice when the discrepancy was insignificant between the admissible and inadmissible evidence). For example, the corroboration mirrored the testimony of four individuals directly involved in the stabbing of Mr. Molina (Mario Rodriguez, Timothy Martinez, Jerry Armenta, and Jerry Montoya). They testified that (1) Mr. Sanchez had organized the Molina murder and (2) Mr. Baca had spoken often about the Molina murder and had threatened one of the participants.

We thus conclude that Mr. Sanchez and Mr. Baca haven't shown actual prejudice that outweighs the expense and inconvenience of separate trials.

**(ii)    Even if actual prejudice had otherwise existed, the district court enjoyed discretion to alleviate the prejudice through limiting instructions.**

Even if actual prejudice exists, the court can often cure the prejudice through "less drastic measures, such as limiting instructions." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). We often consider limiting instructions because we presume that juries follow them. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

That presumption applies because the district court gave extensive instructions on how the jury was to consider evidence. For example, when the trial started, the court told the jury that

- an instruction "not to consider a particular statement" prevented any reference to that statement in the deliberations and

- an instruction to "consider a particular piece of evidence for a specific purpose" restricted the jury to considering the evidence "only for that purpose."

R. vol. 5, at 14,650. And when the court allowed introduction of the recordings, the court gave clear limiting instructions. *See, e.g.*, *id.* at 11,189 (instructing the jury to consider a recording of Mr. Perez only in the deliberations "as to Mr. Perez and not as to the other three defendants"). And in the final instructions, the court again instructed the jury

- to consider the recordings only "as evidence against the defendant who [was] the subject of the recording," Supp. R. vol. 1, at 565,

88

- to use the evidence admitted for a limited purpose, *id.* at 551, and

- to separately consider the guilt of each defendant, *id.* at 549, 585, 592.

Mr. Sanchez and Mr. Baca argue that the sheer number of limiting instructions prevented the jury from following the instructions. For this argument, Mr. Sanchez says that the district court issued more than 120 limiting or curative instructions during the trial. *See* p. 68 n.10, above. And Mr. Sanchez points to an incident where even the prosecutor misinterpreted the limited purpose of particular evidence. R. vol. 1, at 1941; R. vol. 5, at 5680.

Mr. Sanchez overstates the difficulty of following the limiting instructions and cites no authority suggesting the jury's inability to compartmentalize the evidence against each defendant. *See United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) ("In general, the strong presumption is that jurors are able to compartmentalize evidence by respecting limiting instructions specifying the defendants against whom the evidence may be considered."); *see also United States v. Hines*, 696 F.2d 722, 732 (10th Cir. 1982) ("[T]here is no prejudice if evidence is such that the jury could compartmentalize it against each defendant."). In fact, many of the cited instructions involve something other than a recorded statement. *See, e.g.*, R. vol. 5, at 6916, 10,763, 11,417 (instructing the jury to

disregard a non-responsive answer). And many other instructions just told the jury to use the statements for a particular purpose other than to prove the truth of the matter. *See, e.g.*, *id.* at 6279, 9558, 9913, 10,364, 10,862, 10,888, 11,416, 11,922, 11,943, 11,945, 12,506, 12,948–49.

As the Defendants point out, however, the district court did issue many limiting instructions about the recordings. For example, in a 2-day period, the district court issued 23 limiting instructions about the recordings. *Id.* at 10,625, 10,651, 10,815, 10,837, 10,849–50, 10,855–56, 10,860, 10,874, 10,876–77, 10,881–83, 10,886, 10,894, 10,903, 10,910, 10,917–20, 10,922, 10,924, 10,928, 10,934. Each time a recording was admitted, the court told the jury that the recording could be used only against Mr. Baca, not Mr. Herrera or Mr. Sanchez. Over the next 2 days, the court issued roughly 14 more limiting instructions as to the use of recorded statements by Mr. Perez or Mr. Herrera. *Id.* at 11,189, 11,214, 11,225, 11,228, 11,232, 11,256, 11,259, 11,275, 11,277, 11,291, 11,296, 11,305, 11,332, 11,377. Given the discrete timing of the recordings and the repeated issuance of the same limiting instructions, the court could reasonably credit the jury's ability to follow the limiting instructions. *See United States v. Pinto*, 838 F.2d 426, 434 (10th Cir. 1988) (concluding that "the jury was able to compartmentalize the evidence as to each of the defendants" based on the district court's limiting instructions and the

90

government's presentation of evidence against a codefendant at a discrete

point in the trial).

In crediting the jury's ability to follow the instructions, the district

court could properly consider the jury's distinctions among the defendants.

For example, the jury found Mr. Perez not guilty and the other defendants

guilty. *See United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005)

(noting that the acquittal of codefendants on some charges showed that the

jury had separately considered each defendant).

Given the discrete timing of the recordings, the repeated use of the

same limiting instructions, and the acquittal of Mr. Perez, we conclude that

the district court acted within its discretion by crediting the jury's ability

to follow the many limiting instructions.

> **B.    Severance wasn't required based on live testimony
> recounting out-of-court statements that had directly
> implicated Mr. Sanchez.**

Mr. Sanchez also relies on live testimony about two out-of-court

statements that directly implicated him:

1.    Mr. Urquizo testified that Mr. Perez had said that he gave a
      shank to Mr. Sanchez and Mr. Rodriguez for the murder.

2.    Mr. Armento testified that Mr. Herrera had said that he and Mr.
      Sanchez had the "say-so" in the murder of Mr. Molina.

R. vol. 5, at 7378–79, 8705. But Mr. Sanchez did not apprise the district

court of his complaints about these two out-of-court statements. By failing

to apprise the district court, Mr. Sanchez failed to preserve this argument

91

in district court. *See Fox v. Ward*, 200 F.3d 1286, 1294 (10th Cir. 2000). Even if the argument had been preserved, Mr. Sanchez hasn't shown that the district court abused its discretion, as the district court promptly gave a limiting instruction after each reference. *See* p. 91, above.

\* \* \*

Because Mr. Sanchez and Mr. Baca did not file a timely pretrial motion to sever defendants, they waived this appellate argument. Even without a waiver, the district court would not have abused its discretion in declining to sever the trials of Mr. Sanchez and Mr. Baca.

**6.    All defendants: The district court did not abuse its discretion in denying the motions for a continuance.**

The Defendants argue that the district court erred in denying their two motions to continue the trial. The first motion came after the district court said that it would disqualify Mr. Herrera's lead counsel because of a conflict of interest. At that time, the trial was about two months away. The second motion came months later, days before the trial was to begin. The district court denied both motions.

**A.    We apply the abuse-of-discretion standard.**

We review the denial of a continuance for an abuse of discretion. *United States v. Glaub*, 910 F.3d 1334, 1344 (10th Cir. 2018). The district court abused its discretion only if the rulings were "arbitrary or

92

unreasonable and materially prejudiced the defendant[s]." *Id.* (quoting

*United States v. McKneely*, 69 F.3d 1067, 1076–77 (10th Cir. 1995)).

In applying this standard, we consider four factors:

1.    "[T]he diligence of the party requesting the continuance,"

2.    "[t]he likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance,"

3.    "[t]he inconvenience to the opposing party, its witnesses, and the court resulting from the continuance," and

4.    "[t]he need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance."

*United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990) (en banc)

(quoting *United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987)). The

fourth factor is the most important. *United States v. McClaflin*, 939 F.3d

1113, 1117 (10th Cir. 2019).

**B.    The district court did not err in denying Mr. Herrera's first request for a continuance.**

About two months before trial, the district court stated that it would

disqualify Mr. Herrera's attorney (Mr. Michael Davis) because he had

represented a codefendant. Mr. Herrera had a second attorney (Ms. Carey

Bhalla), who had helped Mr. Davis with legal research and writing. When

the court announced the disqualification of Mr. Davis, Ms. Bhalla became

the sole attorney for Mr. Herrera. Given her inexperience in trying cases,

93

Mr. Herrera asked the district court to appoint a more experienced new lead counsel and to continue the trial.

The district court appointed a new attorney (Mr. William R. Maynard), but denied the request for a continuance. Despite the denial, the court allowed Mr. Herrera to renew the motion for a continuance. R. vol. 5, at 2093. Mr. Herrera never renewed the motion, but he challenges the denial of his motion to continue the trial.

When denying the motion to continue, the district court couldn't have known whether two more months would be enough time for Mr. Maynard to step in as lead trial counsel. That question turned largely on four sets of questions:

1. *How did Mr. Davis leave the case for his successor?* Did Mr. Davis provide Mr. Maynard with material that would facilitate his trial preparation, or would Mr. Maynard need to start over? For example, did Mr. Davis give Mr. Maynard material that he could use to draft an opening statement, closing argument, or examination outlines?

2. *How much help could Mr. Maynard get from Ms. Bhalla in preparing for trial?* She lacked trial experience, but she had represented Mr. Herrera for over a year. Given her presumed knowledge of Mr. Herrera's case, could she help Mr. Maynard in preparing his opening statement, closing argument, and examination outlines?

3. *How much help could Mr. Maynard expect from counsel for Mr. Baca or Mr. Sanchez?* If the Defendants' attorneys had divided responsibility for cross-examinations, Mr. Maynard might have needed to prepare cross-examinations for only a fraction of the government's witnesses. Had defense counsel divided responsibilities for their cross-examinations?

4.      *How quickly could Mr. Maynard absorb the information?* The district court viewed Mr. Herrera's role as limited. Given Mr. Herrera's limited role, how much detail would Mr. Maynard need to learn?

Mr. Herrera's motion for a continuance shed no light on these four sets of questions, so the district court had little meaningful information to assess Mr. Maynard's need for more preparation time. Given the shortage of available information, the district court took a "wait and see" approach. The court acknowledged its inability to know the status of trial preparation. But the court noted that the prior attorney (Mr. Davis) was well-regarded and had likely forwarded the case in good shape. So the court assumed that Mr. Maynard would not need to start over.

But the court recognized that this was just an assumption and told Mr. Herrera's new trial team that they could present new material ex parte if they encountered problems in preparing for trial. Despite this opportunity, Mr. Herrera's new trial team didn't provide the court with any new material showing problems in their preparation.[19]

In a reply brief, Mr. Herrera argues that he did update the court through the second motion to continue and a supplement to the motion.

---

[19]    Based on the failure to provide the court with new material, the government argues that Mr. Herrera failed to preserve the issue. We need not decide the preservation issue. Even if Mr. Herrera had preserved the issue, we'd reject his argument on the merits.

And at oral argument, Mr. Herrera insists that he treated the two motions to continue as part of the same argument for a continuance.

But Mr. Herrera has conflated the two motions for a continuance. The first motion relied on the disqualification of Mr. Davis; the second motion relied on the government's delay in disclosing information. Not only did the grounds differ in the two motions, but the second motion didn't even refer to the earlier request for a continuance or the disqualification of Mr. Davis. So Mr. Herrera's second motion for a continuance did not furnish the district court with any new insight into the need for a continuance because of Mr. Davis's disqualification.

"The first task of an appellant is to explain to us why the district court's decision is wrong." *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015). But Mr. Herrera does not directly challenge the district court's reasoning in denying his first motion for a continuance. *See United States v. Leal*, 32 F.4th 888, 901 (10th Cir. 2022) (rejecting a criminal appellant's arguments that did not directly challenge the district court's reasoning).

Mr. Herrera instead argues that the four-factor test supported a continuance, but we're not deciding the need for a continuance in the first instance. We are deciding only whether the district court abused its discretion through its "wait and see" approach. And Mr. Herrera does not explain how the district judge abused his discretion.

96

In our view, the district court took a reasonable approach when Mr. Herrera had to change attorneys. The court reasoned that because the trial was still two months away, Mr. Herrera's new legal team might have had enough time to prepare.

Mr. Herrera argues that this assumption "was unwarranted and unrealistic." Herrera's Opening Br. at 29–30. But if the court's optimism had been unrealistic, the new trial team had a chance to show the court its error. Despite this chance, the trial team stayed silent. Given that silence, the district court could have inferred that Mr. Maynard had readied himself for trial with help from his client, Ms. Bhalla, Mr. Davis, and counsel for Mr. Baca and Mr. Sanchez.

Mr. Herrera points to later developments in the trial, arguing that they showed inadequate preparation time for the new attorney. But we evaluate the district court's exercise of discretion based on the information presented at the time of the ruling. *See United States v. Sanchez*, 790 F.2d 245, 251 (2d Cir. 1986) ("Our review of the district judge's exercise of discretion [to try the defendant in absentia rather than conduct separate trials or continue both trials] must be based on the relevant circumstances confronting the judge at the time of his ruling, without the benefit of hindsight."); *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982) (per curiam) ("We must evaluate the validity of the court's ruling in light of the information available to the trial judge at the time of his ruling.").

\* \* \*

If the prior attorney hadn't left the case in proper shape, the new trial team could have privately told the district court. But the new trial team didn't use that opportunity. And in the later motion to continue, the new trial team shifted gears, complaining about the timing of the government's disclosures and saying nothing more about the disruption from the change in counsel. So we conclude that the district court acted within its discretion in declining to continue the trial based on the disqualification of Mr. Davis. *See United States v. Akins*, 746 F.3d 590, 608–609 (5th Cir. 2014) (concluding that the district court didn't abuse its discretion by denying a continuance when the case was complex and the defendant's new attorney had been appointed only 46 days before the trial).

## C.   The district court did not err in denying the Defendants' second motion for a continuance.

Days before the trial was to start, Mr. Herrera, Mr. Baca, and Mr. Sanchez moved for a continuance based on the government's disclosure of voluminous evidence in the runup to trial. The district court denied the motion for a continuance.

On appeal, the Defendants argue that the district court abused its discretion in declining to grant the continuance based on the government's delay in disclosures. We conclude that the district court acted within its discretion.

98

In denying the second motion to continue, the district court gave seven reasons:

1.  The Defendants had enough time to review most of the discovery, and the inmates' continued phone calls made ongoing disclosures inevitable.

2.  The Defendants had years to prepare, and the district court had granted multiple continuances.

3.  The public's interest in proceeding to trial outweighed the interests of defense counsel in reviewing the inmates' recorded phone calls, which had occupied much of the late disclosures.

4.  The government had acted in good faith in producing discovery materials throughout the litigation.

5.  The recently disclosed evidence was probably not material.

6.  Defense counsel could review newly disclosed material during the trial's off-hours.

7.  The jury selection process was already underway.

Supp. R. vol. 1, at 652–54.

On appeal, the Defendants again argue that the four factors supported a continuance. But we're not applying these factors in the first instance; we're just evaluating the reasonableness of the district court's application of these factors.

First, the district court reasoned that (1) the Defendants had already received most of the discovery and (2) the late disclosures had largely involved inmates' continuing phone calls. Given the continuing phone

calls, the court reasoned that the government would need to keep making disclosures shortly before the trial with or without a continuance.

The Defendants argue that they couldn't use all of the late-disclosed evidence, had to restrain their cross-examinations to avoid missteps, and couldn't prepare as well as the prosecutors. But the district court considered the Defendants' inability to review every discovery item, concluding that this inability wouldn't prevent a fair trial. Though another judge might have reached a different conclusion, the district court's conclusion was at least reasonable.

The late disclosures largely consisted of the inmates' recorded calls. Before disclosing those calls, the government had to identify the participants and assess the materiality of the calls. To identify the participants and assess materiality, the government had to spend time listening to the recordings to determine the need for disclosure. After listening to the calls, the government provided logs, identifying the dates of the calls and the participants.[20] Because the government furnished

---

[20]     This is an example of the logs:

recordings for almost 60,000 calls, the government had to listen to the calls in order to assess the need for disclosure and to provide meaningful logs. So some delay was inevitable. And because the calls continued through the trial, delays in disclosure would presumably recur even with a continuance. Given that reality, the district court acted reasonably by concluding that a continuance would not prevent disclosure of at least some recordings on the eve of trial.

Second, the district court reasoned that it had already granted multiple continuances, giving the Defendants years to prepare. This rationale was at least reasonable. The government had indicted the Defendants in October 2015. Based on that indictment, the court scheduled the trial to start in October 2016. But the court granted three continuances before rescheduling the trial roughly 1½ years after the initial trial date.

| BATES NO(S) | DESCRIPTION |
|---|---|
| | Audio of a call between Ronald Sanchez and Daniel Sanchez 11-07-2017 |
| | Audio of a call between Ronald Sanchez and Daniel Sanchez 11-14-2017(2) |
| | Audio of a call between Ronald Sanchez and Daniel Sanchez 11-14-2017(3) |
| | Audio of a meeting between FBI, Mario Rodriguez and Ronald Sanchez on 11-16-2017 |
| | Audio of jail call between Shauna Gutierrez and her mother.245U-AQ-6239655_0001398_1A0000717_0000001 |

Supp. R. vol. 2, at 468.



The Defendants disregard those continuances and insist that the court could have rescheduled the trial again. But this argument ignores the district court's need to schedule the second trial and another trial for a related case.

The district court had set aside *eight* weeks for the trial of Mr. Herrera, Mr. Sanchez, Mr. Baca, and Mr. Perez. And after this trial, the court had to conduct two more trials in related cases, which would collectively take sixteen more weeks. So a fourth continuance of this trial likely would have had a domino effect, requiring the court to reset other trials occupying sixteen weeks.

In his reply brief, Mr. Herrera argues that the court could have rescheduled his trial after the other two. Presumably, Mr. Herrera is implying that the court could have granted an eight-month continuance,

moving the trial from January to September 2018. But we presume that these weren't the district judge's only cases going to trial. And we lack any information about the district judge's trials in unrelated cases.[21] Reshuffling the trials could have disrupted preparation and delayed trials for not only the defendants in the related cases but also countless other defendants awaiting trial. *See Gandy v. Alabama*, 569 F.2d 1318, 1323 n.9 (5th Cir. 1978).[22]

---

[21]    Mr. Herrera asserts:

> The government . . . offers no reason why Mr. Herrera's trial could not have been rescheduled after those other trials. After all, it was apparent that Mr. Herrera and his codefendants were asking for a significant continuance (not just for an extra week or two), and they did not voice any concern about being placed at the back of the line.

Herrera's Reply Br. at 16. This assertion masks the dilemma facing the district court: The new trial team never told the judge how much more time they wanted. Without that information, the judge just knew that a continuance would likely upend his other trial settings.

[22]    The *Gandy* court stated:

> To permit a continuance to accommodate one defendant may in itself prejudice the rights of another defendant whose trial is delayed because of the continuance. Played to an extreme conclusion, this indiscriminate game of judicial musical chairs could collapse any semblance of sound administration, and work to the ultimate prejudice of many defendants awaiting trial in criminal courts.

*Gandy*, 569 F.3d at 1323 n.9.

103

Even if the district court had sua sponte considered an eight-month continuance, it could have jeopardized the Defendants' prosecutions under the Speedy Trial Act. *See* 18 U.S.C. § 3161(c)(1). The eight-month delay would stem from the district court's need to conduct the other two trials. But "[n]either a congested court calendar nor the press of a judge's other business can excuse delay under the [Speedy Trial Act]." *United States v. Andrews*, 790 F.2d 803, 808 (10th Cir. 1986); *see also* Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(C) (disallowing an ends-of-justice continuance "because of general congestion of the court's calendar").[23] So the district court acted reasonably in declining to grant a fourth continuance.

Third, the district court reasoned that the public had an interest in proceeding to trial. This rationale was again at least reasonable, for the Speedy Trial Act reflects congressional intent "to serve the public interest in bringing prompt criminal proceedings." *United States v. Apperson*, 441 F.3d 1162, 1177–78 (10th Cir. 2006); *see* p. 104 n.23, above.

Fourth, the district court reasoned that the government had acted in good faith in producing discovery materials throughout the litigation. The

---

[23]    The Speedy Trial Act promotes the interests of not only the defendants but also the public. *See Zedner v. United States*, 547 U.S. 489, 500–501 (2006) ("[T]he Speedy Trial Act] was designed with the public interest firmly in mind."). So the Defendants' consent would not have automatically justified exclusion of the eight-month period under the Speedy Trial Act. *See United States v. Williams*, 511 F.3d 1044, 1054–55 (10th Cir. 2007).

104

Defendants accuse the government of gamesmanship, but the district court disagreed. Perhaps other judges might have sided with the Defendants, but the district court's characterization was at least reasonable.

Fifth, the district court reasoned that the late disclosures had probably involved immaterial information. This rationale was again at least reasonable. The late disclosures largely involved impeachment material involving recorded calls by prosecution witnesses, and the Defendants already had thousands of pages of written statements and hundreds of hours of recorded statements to use in impeaching the government's witnesses.

Sixth, the district court reasoned that defense counsel would have time during the trial to continue reviewing discovery materials. This rationale was again at least reasonable. Indeed, the Defendants did use at least some of the newly furnished information in questioning witnesses.

Finally, the district court reasoned that the court and parties had already invested extensive time and effort in planning for the trial to proceed as planned. The court had already summoned roughly 200 potential jurors, and the parties had "read numerous special questionnaires." Supp. R. vol. 1, at 654. The Defendants do not address this part of the rationale,

and it was at least reasonable. The court could legitimately consider the inconvenience to itself, the jurors, and the parties.[24]

* * *

The district court had discretion to deny the two requests for continuances. In exercising this discretion, the court considered the pertinent factors and reasonably concluded that they weighed against the requested continuances. This conclusion fell within the district court's discretion.

**7.    All defendants: The Defendants waived their challenge to the constitutionality of VICAR's position clause.**

The Defendants were convicted of violating VICAR's "position clause," which outlaws racketeering activity to maintain or enhance one's position in the enterprise. 18 U.S.C. § 1959(a). The parties disagree on the constitutionality of the clause. The government defends the clause based on Congress's power under the Commerce Clause. The Defendants argue that the Commerce Clause does not support constitutionality of the clause with respect to their alleged conduct.

---

[24]    Mr. Herrera asserts that we should disregard inconvenience to the district court because the government failed to act cooperatively, diligently, or responsibly. But the district court rejected Mr. Herrera's characterization of the government's conduct, and that rejection was reasonable. *See* pp. 104–105, above. So the district court could consider inconvenience.

Mr. Herrera, Mr. Baca, and Mr. Sanchez waived the issue by failing to raise a pretrial challenge to the constitutionality of VICAR's position clause. After the trial, another defendant in a later trial (Arturo Garcia) challenged the constitutionality of the position clause. Mr. Herrera, Mr. Sanchez, and Mr. Baca orally asked for leave to join the motion.

The court denied Mr. Garcia's motion. *United States v. DeLeon*, 2020 WL 353856, at *67–72, 87, 42, 99–105 (D. N.M. Jan. 21, 2020) (unpublished). In denying the motion, the court acknowledged that Mr. Herrera, Mr. Baca, and Mr. Sanchez had asked to join Mr. Garcia's motion. *Id.*, 2020 WL 353856, at *42. But the court did not decide the Commerce Clause issue for Mr. Herrera, Mr. Baca, or Mr. Sanchez.

A. **Because the constitutional argument is not jurisdictional, the Defendants needed to make this argument in a pretrial motion to dismiss.**

The government argues that the Defendants did not preserve these challenges. Preservation turns on whether we consider the challenge as a perceived defect in the indictment or a lack of subject-matter jurisdiction.

A pretrial motion is required when a defendant objects to prosecution based on "a defect in the indictment or information," including "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). If the defendant doesn't file a pretrial motion, a later challenge to the prosecution would be considered untimely. Fed. R. Crim. P. 12(c). But a court can consider an

107

untimely challenge when the defendant shows good cause. Fed. R. Crim. P. 12(c)(3).

Jurisdictional challenges are different. For example, defendants can challenge the prosecution based on subject-matter jurisdiction at any time while the case is pending. Fed. R. Crim. P. 12(b)(2).

Mr. Herrera argues that his constitutional challenges involved subject-matter jurisdiction. Under Mr. Herrera's argument, VICAR's position clause exceeds congressional power by encompassing purely state-law crimes. And by challenging congressional power to address state-law crimes, Mr. Herrera argues that he's questioning the district court's jurisdiction, which would obviate the need to file a pretrial motion. The government disagrees, arguing that Mr. Herrera is alleging a defect in the indictment rather than a lack of jurisdiction. We agree with the government.

Mr. Herrera's challenge involves the constitutionality of VICAR both on its face and as applied. We held in *United States v. DeVaughn* that challenges to the constitutionality of a criminal statue do "not implicate a court's subject matter jurisdiction." 694 F.3d 1141, 1153–54 (10th Cir. 2012).[25] There, however, we were addressing an as-applied challenge. *Id.* at

---

[25]   In *DeVaughn*, we observed that "a court has jurisdiction over a criminal case even when it or a higher court later determines the statute under which the defendant was prosecuted is unconstitutional." 694 F.3d at

108

1153. At a minimum, *DeVaughn* would require a pretrial motion for the Defendants' as-applied challenge.

But does *DeVaughn*'s holding also encompass facial challenges to the constitutionality of a criminal statute? We often interpret general language in cases "as referring in context to circumstances then before the Court." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). And the circumstances of *DeVaughn* involved a challenge to a statute as applied, not on its face. 694 F.3d at 1153. Given the factual context of *DeVaughn*, we've later issued unpublished opinions stating that we'd not yet squarely decided whether facial challenges to the constitutionality of a criminal statute involve the court's subject-matter jurisdiction. *See United States v. Rickett*, 535 F. App'x 668, 671 (10th Cir. 2013) (unpublished) (noting that the Tenth Circuit "ha[s] not yet squarely addressed whether a facial challenge to the constitutionality of a statute" is jurisdictional); *United States v. Rangel-Hernandez*, 597 F. App'x 553, 554 (10th Cir. 2015) (unpublished) (same).

---

1154. For this observation, we pointed to *United States v. Williams*, 341 U.S. 58 (1951). There the Supreme Court stated:

> Where a federal court has power, as here, to proceed to a determination on the merits, that is jurisdiction of the proceedings. The District Court has jurisdiction. Though the trial court or an appellate court may conclude that the statute is wholly unconstitutional, . . . , it has proceeded with jurisdiction . . . .

*Id.* at 68–69 (footnote omitted).

109

But even before deciding *DeVaughn*, we had implied in *United States v. Fox*, 573 F.3d 1050, 1052 n.1 (10th Cir. 2009), that a challenge to the constitutionality of a criminal statute isn't jurisdictional. There the defendant had pleaded guilty to possession of a firearm after a felony conviction. *Id.* at 1051–52. In pleading guilty, the defendant reserved his right to appeal based on a treaty right. *Id.* at 1052 n.1. On appeal, the defendant argued for the first time that the criminal statute violated the Constitution. *Id.* We held that in pleading guilty, the defendant had waived all "non-jurisdictional challenges" other than the one involving a treaty right. *Id.*

For the sake of argument, we can assume that our precedents in *DeVaughn* and *Fox* didn't decide whether facial challenges are jurisdictional or nonjurisdictional. So we must decide this issue, considering the case law from other circuits and the Defendants' manner of presenting the constitutional challenge.

Outside our circuit, courts are divided. The First, Second, Sixth, and D.C. Circuits have held that facial constitutional challenges are non-jurisdictional. *See United States v. Rios-Rivera*, 913 F.3d 38, 43 (1st Cir. 2019) (noting that jurisdiction wasn't implicated by a defendant's challenges to Congress's constitutional authority to enact the statute of conviction); *United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018) (rejecting a defendant's characterization of his facial constitutional

challenge to the statute of conviction as jurisdictional); *United States v. Bacon*, 884 F.3d 605, 609 (6th Cir. 2018) ("[I]f Congress acts outside the scope of its authority under the Commerce Clause when enacting legislation, the validity of the statute is implicated, not the authority of the federal courts to adjudicate prosecution of offenses proscribed by the statute."); *United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996) (per curiam) ("[W]e find that the weight of the precedent, as well as prudential considerations, counsel toward treating facial constitutional challenges to presumptively valid statutes as nonjurisdictional.").

In contrast, the Third, Seventh, Eighth, Ninth, and Eleventh Circuits have held that facial constitutional challenges *are* jurisdictional. *See United States v. Rodia*, 194 F.3d 465, 469 (3d Cir. 1999) (concluding that a facial challenge under the Commerce Clause "goes to the jurisdiction of the District Court"); *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) (stating that "a facial attack on a statute's constitutionality is jurisdictional"); *United States v. Seay*, 620 F.3d 919, 922, 922 n.3 (8th Cir. 2010) ("We have previously held that . . . facial attacks are jurisdictional in nature."); *United States v. Johnston*, 199 F.3d 1015, 1019 n.3 (9th Cir. 1999) (noting that the Ninth Circuit regards facial constitutional challenges to statutes as jurisdictional); *United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011) ("The constitutionality of . . . the statute under which defendants were convicted, is a jurisdictional issue.").

111

The logic of the First, Second, Sixth, and D.C. Circuits aligns more closely with our reasoning in *United States v. DeVaughn*. *See* pp. 108–109, above. In *DeVaughn*, we reasoned that the constitutional challenge to a criminal statute was not jurisdictional because

- jurisdiction involves a court's power to adjudicate a case and

- deciding the constitutionality of a statute "is squarely within the power of the federal courts."

694 F.3d at 1153–54. This reasoning applies to facial challenges as well as to as-applied challenges, for district courts have the power to act regardless of whether a constitutional challenge is facial or as applied. "If a challenge to the constitutionality of an underlying criminal statute always implicated subject-matter jurisdiction, then federal courts, having an obligation to address jurisdictional questions *sua sponte*, would have to assure themselves of a statute's validity as a threshold matter in any case. This requirement would run afoul of Supreme Court precedent declining to address constitutional questions not put at issue by the parties." *United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996) (per curiam).

We can consider not only the logic of *DeVaughn* but also how the Defendants raised the issue. In his motion to dismiss, Mr. Garcia made three distinct arguments: (1) VICAR's position clause is facially unconstitutional, (2) the position clause is unconstitutional as applied, and (3) the district court lacked subject-matter jurisdiction. Supp. R. vol. 1, at

112

620–40. Mr. Baca, Mr. Herrera, and Mr. Sanchez asked for leave to join this motion with its three distinct arguments.[26] By seeking to adopt Mr. Garcia's formulation of the issues, Mr. Baca, Mr. Herrera, and Mr. Sanchez implicitly treated the jurisdictional challenge separately from the constitutional challenges. So in district court, the Defendants challenged the constitutionality of the position clause without addressing jurisdiction.

Based on the case law and the Defendants' presentation in district court, we don't regard the constitutional challenge as jurisdictional. The challenge instead rested on a defect in the indictment, which the Defendants needed to raise in a timely pretrial motion or to show good cause.

### B.    The Defendants failed to raise the constitutional challenge in a timely pretrial motion.

Despite that obligation, the Defendants didn't file a pretrial motion on the constitutionality of VICAR's position clause. The Defendants thus waived the constitutional issue.

Mr. Herrera argues that even if he and his codefendants had waived the argument, the government "waived the waiver" by failing to argue in district court that the Defendants needed to raise the issue in a pretrial

---

[26]    In challenging subject-matter jurisdiction, Mr. Garcia referred broadly to "many of the same reasons" discussed in his constitutional challenges. Supp. R. vol. 1, at 638.

motion. We disagree. The Defendants never submitted a document with the constitutional challenge, so the government had no chance to respond in writing. Without a chance to address the issue, the government couldn't have "waived the waiver." *See* Fed. R. Crim. P. 51(b) ("If a party does not have an opportunity to object to a ruling . . . the absence of an objection does not later prejudice that party.").

The Defendants disagree, pointing to oral argument in district court. The oral argument involved many pending motions involving over twenty defendants. By the time of this oral argument, Mr. Sanchez and Mr. Herrera had already finished briefing their post-judgment motions. These briefs had contained no mention of the Commerce Clause.

But another defendant, Mr. Arturo Garcia, had orally moved to dismiss his indictment, challenging the constitutionality of VICAR's position clause.[27] The district court denied the motion in a 17-page order. Months later, Mr. Garcia filed a renewed motion and supporting brief, arguing that (1) VICAR's position clause was unconstitutional both facially and as applied and (2) the district court lacked subject-matter jurisdiction. The district court conducted oral argument.

At oral argument, Mr. Garcia urged reconsideration of his challenge as applied to his indictment. The court asked the attorneys for the other

---

[27]    His VICAR charge involved the murder of another inmate, Freddie Sanchez.

defendants if they were joining this motion. Nothing was said by counsel for Mr. Herrera, Mr. Sanchez, or Mr. Baca.

The government and Mr. Garcia then argued their positions. Upon completion of the oral argument, Mr. Herrera, Mr. Sanchez, and Mr. Baca finally asked permission to join the motion:

| | |
|---|---|
| Ms. Jacks: | Your Honor, I never understood this issue until this morning. And I join the arguments on it. We had not joined, and I'd ask the Court's permission to join [the motion by Mr. Garcia's attorney] on behalf of Mr. Sanchez. |
| Mr. Lowry: | Same for Mr. Baca. |
| Ms. Bhalla: | Same for Mr. Herrera as well. |

R. vol. 5, at 5943.

The district court then explained its inclination "to deny [Mr. Garcia's] motion" without

- addressing the Defendants' request or

- allowing the government to respond to the Defendants' request for permission to join Mr. Garcia's oral motion to reconsider.

The court issued a written order denying Mr. Garcia's motion, mentioning in a footnote that Mr. Sanchez and Mr. Herrera had joined the motion. *United States v. DeLeon*, 2020 WL 353856, at *16 n.10 (D. N.M. Jan. 21, 2020) (unpublished).[28]

---

[28] In this footnote, the court didn't mention Mr. Baca's intent to join the motion. But the court elsewhere acknowledged Mr. Baca's request to

The Defendants argue that the government "waived the waiver" by failing to orally object to the request for permission to join Mr. Garcia's motion. But the court never gave the government a chance to object. *See Lovinger v. Cir. Court*, 845 F.2d 739, 744–45 (7th Cir. 1988) (stating that the defendant did not waive an objection by declining to interrupt the judge "in the few moments between the surprise mistrial declaration and the judge's departure from the courtroom"); *United States v. Rodriguez*, 938 F.2d 319, 321 n.3 (1st Cir. 1991) (concluding that the government did not waive an appellate challenge by failing to object when the district court adjourned right after ruling). Without a chance to object, the government couldn't have waived an argument as to the need for a pretrial motion.

* * *

Because the Defendants have not preserved their argument under the Commerce Clause or urged good cause, we decline to consider the constitutional challenge. *See United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019) ("[W]e will not review an untimely Rule 12 argument absent good cause.").

---

join the motion. *United States v. DeLeon*, 2020 WL 353856, at *42 (D. N.M. Jan. 21, 2020) (unpublished).

116

**8.    Defendant Herrera: The district court didn't prevent a full and fair defense by prohibiting Mr. Herrera from impeaching his own out-of-court statements.**

Mr. Herrera argues that the district court prevented a full and fair defense. This argument stems from Billy Cordova's testimony that Mr. Herrera had boasted about calling the "hit" on Mr. Molina. To counter this testimony, Mr. Herrera wanted to use his own recorded statements denying involvement in the Molina murder. The district court responded that Mr. Herrera could use his prior recorded statements only if he were to testify. He declined to testify and argues that he should have been allowed to play the recordings anyway.

**A.    Mr. Herrera preserved this challenge, so we apply the abuse-of-discretion standard.**

The government argues that Mr. Herrera did not preserve this argument. We disagree.

**(1)    Preservation didn't require Mr. Herrera to make an offer of proof.**

The government denies preservation based on Mr. Herrera's failure to make an offer of proof. An offer of proof is usually required to preserve a challenge to the exclusion of evidence. Fed. R. Evid. 103. But an offer of proof is unnecessary when the "substance was apparent from the context." Fed. R. Evid. 103(a)(2); *see United States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018) (stating that no offer of proof is required when "the context in which evidence is offered makes clear the reason for the

117

proffer" (quoting *United States v. Martinez*, 776 F.2d 1481, 1485 (10th Cir. 1985))).

Mr. Herrera preserved his argument because the contents of his statements were "apparent from the context." Fed. R. Evid. 103(a)(2). When the district court ruled, it obviously recognized that Mr. Herrera had wanted to counter Mr. Cordova's testimony with the recorded statements. For example, Mr. Herrera said in a recording that he'd not participated in the Molina murder. The district court listened to this recording and discussed its admissibility. So the district court knew what Mr. Herrera wanted to present and recognized his argument for admissibility.

**(2)  The ruling was definitive.**

The government also argues that the district court didn't make a definitive ruling to exclude the proposed statements. We disagree, for the ruling left no room for uncertainty:

> [Y]ou can't get -- use contradictory statements of Herrera to impeach Herrera . . . .
>
> I think I've explained that in a prior opinion, that it's not an 806 issue. But you can impeach, but you've got to have a prior inconsistent statement . . . .
>
> Just so we're clear. I'm not saying you can't impeach Mr. Archuleta. Where I think I'm shutting you down right at the moment is impeaching Mr. Herrera through Mr. Archuleta.

R. vol. 5, at 9604–606. This ruling was definitive.

**B.** **The district court did not abuse its discretion in excluding Mr. Herrera's out-of-court statements.**

Because Mr. Herrera preserved the issue, we consider whether the district court abused its discretion. *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014). We conclude that the district court acted within its discretion when excluding the evidence under Federal Rules of Evidence 801 and 806. These rules address the admissibility of out-of-court statements. Rule 806 provides that when an out-of-court statement is admitted under Rule 801(d)(2)(C), (D), or (E),[29] another party may attack the declarant's credibility and support the attack with "any

---

[29]    Federal Rule of Evidence 801(d)(2) defines an out-of-court statement by an opposing party as non-hearsay when

[t]he statement is offered against an opposing party and:

(A)    was made by the party in an individual or representative capacity;

(B)    is one the party manifested that it adopted or believed to be true;

(C)    was made by a person whom the party authorized to make a statement on the subject;

(D)    was made by the party's agent or employee on a matter within the scope of that relationship while it existed; or

(E)    was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806.

Mr. Herrera argues that Rule 806 covered the government's use of his own alleged statement to Mr. Cordova. That statement would constitute an admission of a party opponent, which is governed by Federal Rule of Evidence 801(d)(2)(A). This rule doesn't fall within the provisions listed in Rule 806.

Though Rule 806 doesn't expressly cover statements by party opponents, Mr. Herrera urges a broad interpretation of Rule 806 because of a defendant's constitutional right to present a full and fair defense. But Rule 806 should be interpreted as written.

The starting point is the text itself. Rule 806 is clear: it applies to hearsay statements or statements admitted under Rule 801(d)(2)(C), (D), and (E). Because the rule includes a list of relevant statutory provisions, the negative-implication canon applies. Under this canon, "the expression of one item of an associated group or series excludes another left unmentioned." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) (cleaned up). So Rule 806's inclusion of subsections (C), (D), and (E) appears to imply the exclusion of subsection (A), the provision governing an admission of a party opponent.

Mr. Herrera argues that this interpretation of Rule 806 would prevent him from advancing a full and fair defense. For this argument, Mr. Herrera

120

points to Rule 806's advisory committee notes and legislative history. The Senate's report on Rule 806 notes that the Committee on the Judiciary "considered it unnecessary to include statements contained in rule 801(d)(2)(A) and (B)—the statement by the party-opponent himself or the statement of which he has manifested his adoption—because the credibility of the party-opponent is always subject to an attack on his credibility." Sen. Rep. 93-1277, 1974 U.S.C.C.A.N. 7051, 7075 n.27. But when the statutory text is unambiguous, we need not rely on legislative history. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of *otherwise ambiguous terms*." (emphasis added)). In our view, Rule 806 is unambiguous.

Mr. Herrera points to First and Seventh Circuit opinions, which say that a non-testifying defendant's out-of-court statement may be admissible for impeachment purposes under Rule 806. *See United States v. Shay*, 57 F.3d 126, 131–32 (1st Cir. 1995) (noting that there is no "categorical exclusion" of a non-testifying defendant's out-of-court statements admitted under Rule 801(d)(2)(A)); *United States v. Dent*, 984 F.2d 1453, 1460 (7th Cir. 1993) (noting that the defendant's "unusual argument in favor of impeaching defendant's own admission and credibility is possible under Rule 806").

These opinions are neither precedential nor applicable. They involved the use of an out-of-court statement for impeachment, not for its truth. Even the Seventh Circuit has noted that its broad reading of Rule 806 does not apply when a party is seeking to circumvent the hearsay rules. For example, in *United States v. Faruki*, 803 F.3d 847 (7th Cir. 2015), the Seventh Circuit rejected the defendant's effort to use his own prior exculpatory statements. *Id.* at 856. The court explained that introduction of the other statements wasn't necessary to contextualize the admitted part of his conversation, so the district court did not abuse its discretion in "exclud[ing] any prior out-of-court statements by [the defendant] offered to prove that [he] had been truthful in speaking with [the government witness]." *Id.*

Here the district court provided a similar explanation:

THE COURT: But I do think in that situation you would be trying to get it in for the truth of the matter. You want the jury to hear that Mr. Herrera is denying participation in that.

MS. BHALLA: I think it depends on how he answers the questions, if that's fair. I mean, I think if we ask the witness, "Isn't it true that he also told you he had nothing do with it," and he says, "No," I think we get to go there.

THE COURT: Yeah, but I don't think you better be asking that sort of question if we know the answer is going to be yes. So you just can't elicit your own client's out-of-court statement. The question would be objectionable. I wouldn't let the witness answer it. So you're not going to get to impeach him with it.

R. vol. 5, at 8603.

122

The district court reasoned that Mr. Herrera could not use his own out-of-court statements to prove the truth of the matter asserted. And even now, Mr. Herrera doesn't challenge this part of the district court's explanation. That explanation rests on Rule 806's narrow scope: The rule addresses only the use of an out-of-court statement to attack the declarant's credibility, not to prove the truth of something else that the declarant had said out-of-court. So the court would have acted within its discretion even if Mr. Herrera could have used his recorded statements to impeach Mr. Cordova.

**9.    All defendants: No cumulative error occurred.**

The Defendants argue that even if the district court had not committed an individual error, the cumulative-error doctrine would warrant a new trial. "Cumulative error is present when the 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003) (quoting *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002)). In assessing the possibility of cumulative error, we can "consider [only] actual errors in determining whether the defendant's right to a fair trial was violated." *Id.*; *see United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc) ("[A]

123

cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

We have concluded that the district court did not err on most of the issues. We've addressed harmless error only when we assumed that the district court should have excluded evidence of a murder in 1989. *See* Part 3(C), above. With that assumed error, we also consider suppressed material that we've considered immaterial. *See Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) (stating that the analysis on cumulative error should include *Brady* errors that "have been individually denied for insufficient prejudice"). The only such material was Mr. Rodriguez's recorded phone call to his mother. *See* Part 2(D), above.

Even when the evidence is combined, our confidence in the outcome isn't undermined by (1) the introduction of evidence regarding the 1989 murder and (2) the assumed suppression of Mr. Rodriguez's recorded phone call. Both items affected mainly Mr. Baca, with only indirect effects on Mr. Herrera and Mr. Sanchez.

For Mr. Baca, the Rodriguez recording would have provided little help. Even without the recording, Mr. Baca proved that Mr. Rodriguez had told the FBI that he thought that Mr. Baca would have stopped the Molina murder if he'd been at the Las Cruces prison. *See* Part 2(D)(1), above. Mr. Rodriguez's statement to his mother was consistent with what he'd told the FBI. *See id.*

At the same time, Mr. Baca didn't deny that he had committed murders in the past. For example, the government presented evidence (without objection) that Mr. Baca had ordered the murder or assault of three other inmates in the 1990s and 2000s. *See* p. 54, above.

Even when we combine the introduction of evidence as to the 1989 murder and assumed suppression of the Rodriguez recording, we remain confident that the outcome would have been the same. *See Johnson v. Carpenter*, 918 F.3d 895, 909 (10th Cir. 2019) (rejecting a claim of cumulative error based on our confidence that the sentence "would have remained the same" after "combining the prejudice resulting from . . . three presumed errors"). So we reject the argument involving cumulative error.

## 10.    Conclusion

We affirm. The government's delay in producing information did not create a denial of due process. Nor did the district court commit reversible error in denying severance, in allowing evidence of prior bad acts, in declining to continue the trials, or in excluding Mr. Herrera's recordings. And the Defendants waived their constitutional challenge to VICAR's position clause by failing to address the issue in a pretrial motion. Finally, the district court did not commit cumulative errors.